UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LESTER WATERS JR.,<br><br>Defendant. | 5:18-CR-50015-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 61). A hearing was held on Tuesday, November 20, 2018. Defendant was personally present and represented by his attorney of record, Robert Rohl. The Government was represented by the Assistant United States Attorney Heather Sazama. Bureau of Indian Affairs Special Agent Darrell Robinson and Oglala Sioux Tribe Department of Public Safety Officer Alec Morgan testified at the hearing. Four exhibits were received into evidence. Supplemental briefing concluded on January 11, 2019. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be granted in part and denied in part.

**JURISDICTION**

Defendant is charged in an Indictment with Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153; Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 113(a)(6) and 1153; and Discharging, Brandishing, or Possessing a Firearm During and In Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

**FACTUAL BACKGROUND**

On January 25, 2018, BIA Special Agent ("SA") Darrell Robinson was called to respond to a reported shooting at the Loren Waters residence north of Pine Ridge, South Dakota. (Doc. 76 at p. 6). Oglala Sioux Tribe Department of Public Safety ("OSTDPS") Officers Charles Hunter and Alec Morgan were also dispatched to the residence. (Id. at p. 7, 24). SA Robinson testified that he has worked for the BIA for over 20 years. (Id. at p. 5–6). Officer Morgan testified that he has worked for the OSTDPS since June 2015. (Id. at p. 23). The court finds SA Robinson and Officer Morgan to be credible witnesses.

Officer Morgan was informed that at least one person had been shot at the residence, but he did not know who was involved, who was inside the residence, whether there were additional victims, or the extent and seriousness of the victims' injuries. (Id. at p. 24, 30–31). One victim was being treated at the Pine Ridge Hospital. (See Ex. 4 (bodycam video)). Before responding to the

residence, Officer Hunter went to the Pine Ridge Hospital and spoke to three witnesses. (Id. at 00:00–15:00). The witnesses were not sure who the shooter was, and the victim was unresponsive and unable to identify who shot him. (Id. at 10:00–30:00). While at the hospital, dispatch reported a 911 call that a male had been stabbed in the face at the Loren Waters residence. (Id. at 12:30).

At approximately 3:45 a.m., Officer Hunter arrived at the Loren Waters residence. (Id. at 41:00). Defendant Lester Waters, Jr., was outside the residence. (Id.). Officer Hunter approached Defendant with his weapon drawn and ordered Defendant to get down on the ground. (Id.). Officer Hunter then handcuffed Defendant, patted him down, and walked him to his patrol vehicle. (Id. at 41:00–46:00). Officer Hunter's dashcam was active, as well as a camera which recorded activity inside the passenger compartment of the patrol vehicle. (Ex. 1, 2, 3).

The vehicle dashcam recorded the ensuing interactions between Officer Hunter, Officer Morgan, and Defendant. At approximately 3:49 a.m., Officer Hunter placed Defendant in the patrol vehicle and said he needed to take Defendant's picture. (Ex. 2 at 45:48). Defendant appeared highly agitated. (Id.). Defendant stated "You know what? Can I tell you something that happened, between me and you?" and Officer Hunter responded "Go ahead." (Id. at 46:00). Defendant launched into an rapid, unsolicited description of the events of the evening, stating, among other things, "I had four shells to it . . . pretty soon [explicative] I say get the [explicative] out, them people come

3

[explicative] through that door and they start firing back at us, you know, they start, I shot the guy, yeah I did, I killed him in self-defense . . . ." (Id. at 46:00–48:12). Officer Hunter ended the conversation by saying "Alright, I need to get back to my business, okay?" and shut the door. (Id. at 48:12). Officer Hunter asked no questions.

Defendant engaged with Officer Hunter again approximately three minutes later, and then shouted to Officer Morgan to come over to the car, calling him "A.B."[1] (Id. at 55:00). Officer Morgan approached and Defendant made a number of unsolicited statements to him. (Id. at 55:00–57:30). Defendant spoke in a rapid, intense, and difficult-to-follow manner, inconsistently naming a variety of different people involved in the shooting, and failing to clarify exactly who he was talking about. In his statements, Defendant described the events leading up to the shooting, including a "crew" coming up from Scottsbluff, and five Mexicans kicking the door down and coming into the house. (Id.). In the middle of his statements, Defendant said, "I plead the Fifth, it's self-defense," and then continued talking. (Id. at 57:30). Defendant then stated he only had four bullets in his gun, and put at least one bullet down the toilet bowl. (Id. at 57:35). Officer Morgan asked, "Is there any bullets in there?" (Id. at 57:40). Defendant responded no, but he wanted more bullets, and said he did not know where "that Warrior girl" was. (Id.). Officer Morgan said "okay" and Defendant said "Go find her right now. But I shot that

---

[1]   Officer Morgan testified that he and Defendant are familiar with each other, because Officer Morgan grew up participating in rodeos that Defendant and his family put on. "A.B." is short for Officer Morgan's first and middle names, "Alec Benjamin." (Doc. 76 at p. 26).

4

guy. I killed him. That [explicative] Elgin Iron Teeth or whatever." (Id. at 57:58–58:00). Officer Morgan asked, "Where did you shoot him at?" and Defendant responded, "I shot him right in the [explicative] chest." Officer Morgan again said, "okay." Defendant continued: "And you go hunt down Lance [explicative] Leftwich." Officer Morgan asked, "What would Lance know?" (Id. at 58:09). Defendant continued on, mentioning several different individuals involved and "Elgie Benson's" crew from Scottsbluff, and then saying "I shot that guy and I said, come get your [expletive] brother. I'm sorry guys. I'm sorry. Whoever Dave Iron Teeth, Elgin Iron Teeth and them are." (Id. at 59:01). Officer Morgan asked, "They are the crew out of Scottsbluff?" and Defendant said yes. (Id. at 59:11). Defendant then continued making unsolicited statements, concluding by telling Officer Morgan to "go see Elgin Iron Teeth and that little crew . . . They are probably on their way back to Scottsbluff or something . . . They're probably at Rico Warrior's right now[.]" (Id. at 59:30–1:00:30). At that point Officer Morgan walked away. (Id. at 1:00:31).

While this conversation was happening, Officer Hunter and other officers secured the residence. At 3:53 a.m., the officers approached the front door with guns drawn and a K-9 unit. (Ex. 4 at 49:00). The K-9 officer shouted several times into the home ordering anyone inside to come out, and then released the K-9 dog. After the dog returned, Officer Hunter ran tape around the perimeter and told another officer he did not know if anyone was hiding in crawl spaces within the house. (Id. at 56:00).

5

At 4:11 a.m., Defendant again called out to Officer Morgan. (Id. at 1:09:18). Defendant began describing the incident again and said "whenever [expletive] Charlie come in there, come in there and [expletive] start raiding house. Start shooting up Luge. They [expletive] surprised them." Officer Morgan asked "Did they have a gun? (Id. at 1:10). Defendant said "[Expletive] yeah, they shot at, they shot Charlie in the face or stabbed him" and Officer Morgan responded "So, who did you shoot?" (Id. at 1:10:20). Defendant responded, "[Expletive], I said, get the [expletive] out of here. I let a round fly in the sky. Pretty soon [expletive] Charlie, what the [expletive] are you doing? I shot, [expletive], I shot one of them." (Id.). Officer Morgan responded "Okay" and Defendant told him "You know, I did kill that guy, and I don't know if the Mexicans loaded him up and headed out, but you go hunt down that Warrior girl." (Id. at 1:10:40). Officer Morgan walked away, terminating the discussion.

Approximately thirteen minutes later, Officer Hunter got into the patrol vehicle and asked Defendant, "Hey man, did you drink tonight?" (Ex. 1 at 13:24). Defendant responded "[Expletive] yeah" and began talking about the events of the night, but Officer Hunter cut him off and informed him that law enforcement was going to take him to the jail for eight hours and let him sober up. (Id. at 13:35). Defendant then stated "You know what? I can tell you this," subsequently making several unsolicited statements including a claim that the gun was registered and only had four bullets. (Id. at 13:50–14:20). Officer Hunter did not ask any further questions. Shortly thereafter at 5:11 a.m.,

6

Officer Hunter transported the Defendant off the scene. At no point was Defendant read his Miranda rights.

On January 29, 2018, this magistrate judge issued a complaint charging Defendant with Assault Resulting in Serious Bodily Injury. (Doc. 1). On February 14, 2018, a federal grand jury issued an indictment charging Defendant with two counts of Assault with a Dangerous Weapon, two counts of Assault Resulting in Serious Bodily Injury, and two counts of Discharging, Brandishing, or Possessing a Firearm During and in Relation to a Crime of Violence. (Doc. 19). The separate counts pertain to two alleged victims, Elgie Iron Bear and Charles Janis. (Id.).

## DISCUSSION

Defendant seeks suppression of his statements made to law enforcement on January 25, 2017, arguing that Defendant was subjected to a custodial interrogation without being informed of his Miranda rights. (Doc. 61; Doc. 83 at p. 1). The United States concedes that Defendant was in custody, but argues that Defendant was not interrogated and his statements are admissible under the public safety exception to Miranda v. Arizona, 384 U.S. 436 (1966). (Doc. 76 at p. 3–4; Doc. 79).

### I.     Miranda And Its Applicable Exceptions

The Fifth Amendment guarantees a suspect the right to remain silent and the right to assistance of counsel during a custodial interrogation. Miranda, 384 U.S. at 444–45. Interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." Butzin v. Wood,

7

886 F.2d 1016, 1018 (8th Cir. 1989) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)).  Interrogation includes not only express questioning, but words or conduct an officer should know are "reasonably likely to elicit an incriminating response from the suspect." Pennsylvania v. Muniz, 496 U.S. 582, 600–01 (1990) (quoting Innis, 446 U.S. at 301).  This test "focuses primarily upon the perceptions of the suspect, rather than the intent of the police . . . A practice that the police should know is reasonably likely to evoke an incriminating response from [the] suspect thus amounts to interrogation." Innis, 446 U.S. at 301.

### A.   Volunteered Statements and Requests for Clarification

The police "cannot be held accountable for the unforeseen results of [suspects'] words or actions." Innis, 446 U.S. at 301–02.  "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [Miranda.]"  384 U.S. at 478.  Accordingly, "statements volunteered by a suspect during the course of routine arrest procedures [are] not the products of interrogation." Butzin, 886 F.2d at 1018 (citing United States v. Webster, 769 F.2d 487, 491–92 (8th Cir. 1985)). "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." Butzin, 886 F.2d at 1018 (internal quotations omitted).

An officer's request for clarification of spontaneous statements generally does not amount to interrogation as conceptualized in Miranda.  United States

8

v. Jackson, 852 F.3d 764, 771–72 (8th Cir. 2017) (citing Butzin, 886 F.2d at 1018; United States v. Jones, 842 F.3d 1077, 1083 (8th Cir. 2016)); United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005); United States v. LaRoche, No. Cr. 08-30056-01-KES, 2008 WL 4224782, at *5 (D.S.D. Sept. 9, 2008). This type of inquiry does constitute interrogation if the question "enhance[s] the defendant's guilt or raise[s] the offense to a higher degree." LaRoche, 2008 WL 4224782, at *5 (quoting Butzin, 886 F.2d at 1018).

### B.   The Public Safety Exception

In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court held that "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence." 467 U.S. at 655.  In this context, protection of the public safety includes protection of the police officers themselves.  Id. at 658 n. 7.  The exception does not depend upon the subjective motivation of the questioning officers.  Instead, the Court adopted an objective standard: the exception applies when "police officers ask questions reasonably prompted by a concern for the public safety." Id. at 656.  It does not apply to "questions designed solely to elicit testimonial evidence from a suspect." Id. at 659.

In applying the public safety exception, the Eighth Circuit has recognized that "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search." United

States v. Liddell, 517 F.3d 1007, 1009–10 (8th Cir. 2008); see United States v. Watters, 572 F.3d 479, 482–83 (8th Cir. 2009) (public safety exception applied to officer's post-arrest question to defendant about whether there was a gun somewhere in busy nightlife area, where dispatch had reported defendant was trying to buy drugs and had said he had a shotgun, and officers feared that suspected gun could be accessible to defendant's friends or to public); United States v. Williams, 181 F.3d 945, 953–54 (8th Cir. 1999) (public safety exception applied to post-arrest question, "is there anything we need to be aware of" in suspect's apartment, because the police "could not have known whether other hazardous weapons were present . . . that could cause them harm if they happened upon them unexpectedly or mishandled them in some way").

## II.  Whether Defendant's Statements Should Be Suppressed

The government concedes that Officer Hunter's question, "Hey man, did you drink tonight?" (Ex. 1 at 13:24) constituted interrogation, and agrees Defendant's response, "[Explicative] yeah!" should be suppressed.  (Doc. 79 at p. 1–2).  The court finds that because alcohol is illegal on the Pine Ridge Indian Reservation, Officer Hunter's question was reasonably likely to elicit an incriminating response.  Muniz, 496 U.S. at 600–01.  Therefore, the court recommends suppression of this statement.

The remainder of Defendant's statements, however, should not be suppressed.  The recording of Defendant's interactions with law enforcement while in the squad car show that Defendant repeatedly initiated very one-sided

10

conversations with Officer Hunter and Officer Morgan. Defendant's volunteered statements—constituting the majority of the video recording, including Defendant's statements to himself while alone in the squad car—are not protected by Miranda and should not be suppressed. Miranda, 384 U.S. at 478.

The following six questions by Officer Morgan require further analysis: "Is there any bullets in there?" (Ex. 2 at 57:40); "Where did you shoot him at?" (Id. at 58:00); "What would Lance know?" (Id. at 58:09); "They are the crew out of Scottsbluff?" (Id. at 59:11); "Did they have a gun? (Id. at 1:10:00); and "So, who did you shoot?" (Id. at 1:10:20). Defendant provided responses to all of these questions.

Officer Morgan's questions to Defendant about firearms—"Is there any bullets in there?" and "Did they have a gun?"—fall squarely within the public safety exception. Watters, 572 F.3d at 482–83. These questions were reasonably prompted by a concern for public safety: officers could reasonably fear that a loaded gun was present on-scene, accessible to the public, and that "they"—presumably, the "crew" from Scottsbluff, or the five Mexicans—could be armed. For these reasons, Defendant's responses to Officer Morgan's questions are admissible under the public safety exception. See Liddell, 517 F.3d at 1009–10.

Defendant's responses to Officer Morgan's additional questions—"Where did you shoot him at?"; "What would Lance know?"; "They are the crew out of Scottsbluff?" and "So, who did you shoot?" are admissible because the

questions constituted requests for clarification. Officer Morgan testified that he not know who was involved in the shooting, who was inside the residence, or whether there were additional victims or the seriousness of their injuries. (Doc. 76 at p. 24, 30–31). Officer Hunter spoke with witnesses, who were not sure who the shooter was, and the victim was unresponsive and unable to identify who shot him. (Ex. 4 at 10:00–30:00). Defendant made numerous unsolicited statements to the officers describing various people involved in the shooting, "the Mexicans," and a "crew" from Scottsbluff, as well as repeating various times that he shot someone. Under these circumstances, it was reasonable for Officer Morgan to attempt to clarify Defendant's statements to determine if other victims or shooters really were present.

Officer Morgan's questions all attempt to clarify Defendant's statements involving shooting a potentially unidentified victim. After being placed in the squad car, Defendant almost immediately told Officer Hunter, "I shot the guy, yeah I did, I killed him in self-defense," without provocation or explaining *who* he shot. (Ex. 2 at 48:00). Shortly after, Defendant told Officer Morgan, "I shot that guy. I killed him," again without provocation. (Id. at 57:50). Officer Morgan's response—"Where did you shoot him at?"—is a clarifying question reasonably interpreted to either ask where on the body the victim was shot or at which geographic location. Officer Morgan's subsequent questions—"What would Lance know?" and "They are the crew out of Scottsbluff?" attempt to clarify unsolicited statements Defendant made about possible witnesses or aggressors. (Id. at 58:09, 59:11). After Defendant called Officer Morgan back

12

to the squad car, he volunteered "Whenever that [explicative] Charlie come in there, come in there and [explicative] start raiding house, start shooting up Luge. They [explicative] surprised them," and Officer Morgan asked, "Did they have a gun?" (Id. at 1:10:00). Defendant responded, "[Explicative] yeah, they shot at, they shot Charlie in the face or stabbed him," and Officer Morgan asked, "So, who did you shoot?" (Id. at 1:10:20). Defendant responded that he shot "one of them," but did not say who. (Id.).

Officer Morgan's requests for clarification of Defendant's unsolicited statements did not amount to interrogation. Jackson, 852 F.3d at 771–72; Butzin, 886 F.2d at 1018. Moreover, because Defendant spontaneously told law enforcement that he shot someone, Officer Morgan's questions did not enhance the defendant's guilt or raise the offense to a higher degree. LaRoche, 2008 WL 4224782, at *5 (quoting Butzin, 886 F.2d at 1018). For these reasons, Defendant's statements to Officer Morgan were not obtained in violation of Miranda and are admissible.

## CONCLUSION

For the aforementioned reasons, it is respectfully recommended that Defendant's Motion to Suppress be granted in part and denied in part.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the District Court. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 15th day of February, 2019.

BY THE COURT:

*[signature]*

DANETA WOLLMANN
United States Magistrate Judge