UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>LESTER WATERS JR.,<br><br>                    Defendant. | CR. 18-50015-JLV<br><br><br>ORDER |

**INTRODUCTION**

A jury found Defendant Lester Waters guilty on all six counts of the indictment.   (Docket 153).   Count I charges assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153; count II charges assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153; count III charges assault with a dangerous weapon and assault resulting in serious bodily injury as charged in counts I and II, with the brandishing and discharge of the firearm during the offense, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); count IV charges assault with a dangerous weapon with the intent to do bodily harm in violation of 18 U.S.C. §§ 113(a)(3) and 1153; count V charges assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153; and count VI charges assault with a dangerous weapon and assault resulting in serious bodily injury as charged in counts IV and V, with the brandishing and discharge of the firearm during the offense in

violation of 18 U.S.C. § 924(c)(1)(A)(iii).   Mr. Waters, appearing *pro se*, filed a motion for a new trial and a motion to dismiss counts III and VI.   (Dockets 192 & 195).   Mr. Waters filed a post-trial memorandum in support of his motions. (Docket 208).   The government opposes Mr. Waters' motions.   (Docket 224). Mr. Waters filed a reply brief in support of his motions.[1]   (Docket 240).   For the reasons stated in this order, Mr. Waters' motions are denied.

MOTION FOR NEW TRIAL

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).   The decision to grant or deny a Rule 33 motion "is within the sound discretion of the [district] court."   United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002).   The court's discretion is both broad and limited.   Id.   It is broad to the extent the court "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."   Id. (citation and internal quotation marks omitted).   Additionally, "the court need not view the evidence most favorably to the verdict."   United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010); United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000) (In determining whether to grant a Rule 33 motion, "the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence

_____

[1]Mr. Waters' reply brief does not specifically address the government's response but reaffirms the arguments made in his initial brief.

2

and evaluate for itself the credibility of the witnesses.").   The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur.   Id.; see also United States v. McCraney, 612 F.3d 1057, 1064 (8th Cir. 2010) ("Where a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.") (citation and internal quotation marks omitted); Worman, 622 F.3d at 978 ("A district court will upset a jury's finding only if it ultimately determines that a miscarriage of justice will occur."); United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009) ("[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice."); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980) ("If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.").

Because a motion for new trial based on the weight of the evidence is "generally disfavored," the district court should use its authority to grant a Rule 33 motion "sparingly and with caution."   Campos, 306 F.3d at 579

3

(citations and internal quotation marks omitted); see also United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007) ("A district court should not grant a motion for a new trial simply because it would have reached a different verdict.") (citations omitted).

## **THE TRIAL EVIDENCE**

PROSECUTION TESTIMONY

Consistent with the directives of Campos, 306 F.3d at 579, Worman, 622 F.3d at 977 and Lacey, 219 F.3d at 783-84, the court finds the following factual summary describes the events which occurred during the evening of January 24 and the early morning hours of January 25, 2018.   The court will describe the trial evidence in a more chronological sequence as opposed to the actual order the evidence was presented in court.

Nona Warrior was at Loren Waters' home beginning at 9-10 p.m. on January 24.[2]   (Docket 180 at p. 121:8-25).[3]   Present were Loren's brother, Garrett Waters, Alyson Caldwell, Tammy Eagle Bull and defendant, whom Nona did not know.   Id. at p. 122:6-14.   Loren[4] was passed out in his bedroom.   Id. at p. 124:20.

---

[2]Nona Warrior has a misdemeanor conviction for filing a false report to law enforcement.   (Docket 180 at p. 121:3-7).

[3]Because the trial transcript is filed in separate entries, the court cites to the page of the transcript in CM/ECF as opposed to the page of the transcript.

[4]The court will identify each of the lay witnesses by their first name except for defendant Lester Waters, Jr.

4

Everyone was drinking.   Id. at p. 123:3-10.   Waters offered Nona a line of methamphetamine, which she took.   Id. at pp. 123:21-124:3.   At some point Waters and Nona got into an argument and he started hitting her.   Id. at p. 125:17-21.   As she got up to leave, Waters threw a bottle at her.   Id. at pp. 125:24-126:1.

Elgie Iron Bear acknowledged using methamphetamine on January 24.[5] Id. at p. 66:6-8.   He drank several beers with his brother, David Iron Bear,[6] that day.   Id. at pp.67:2-25 and 179:6-21.   They decided to cruise around in Elgie's pickup and drink a few more beers.   Id. at p. 68:4-12.

As they were driving around, Elgie and David came upon a young lady walking in East Ridge.   Id. at pp. 68:25-69:8 and 180:1-6.   She was walking alone in the road and appeared upset and was crying.   Id. at p. 69:2-7.   Elgie and David offered her a ride because it was dark and she appeared to be in distress.   Id. at p. 69:15-20.   She introduced herself as Nona and indicated she wanted to cruise around with them.   Id. at pp. 180:20-23 and 181:22. Nona recognized them as the Iron Bear brothers, David and Elgie.[7]   Id. at

---

[5]Elgie Iron Bear has a 2009 felony conviction for possession of methamphetamine.   (Docket 180 at pp. 66:22-67:1).   He also has a 2017 conviction for impersonation to deceive law enforcement.   Id. at p. 94:11-14.

[6]David Iron Bear has a felony conviction and a misdemeanor conviction for false impersonation to a law enforcement officer.   (Docket 180 at p. 178:2-6).

[7]Nona frequently identifies him as "L.J." but the government never made clear whether this was Elgie's nickname.   The court will always identify the witness as Elgie.

pp. 126:19-21, 127:21-23 and 128-128:20-21.   They cruised around for a while drinking.   Id. at p. 127:12-18.

The three of them drove to Manderson, South Dakota, and picked up Rico Iron Bear, a cousin.   Id. at pp. 71:12-18, 129:15-24 and 181:23-24. After going back to the trailer and drinking for a while, they decided to go to Loren Waters' place.   Id. at p. 182:14-18.   Because they knew Loren was a bootlegger, the four of them went to Loren's house to buy alcohol.   Id. at pp. 73:25-74:5 and 131:23-25.

Elgie had previously been to Loren's place about ten times.   Id. at p. 75:10-24.   Loren never had any problems with Elgie stopping by in the past. Id. at p. 75:25-76:2.   From past experience, Elgie knew if Loren was gone or asleep, he had someone watching his door and that person was often armed. Id. at p. 76:13-24.   Elgie thought they got to Loren's house about 3 a.m.   Id. at p. 96:24-97:6.

Elgie walked up to the door with Rico and David behind him.   Id. at pp. 77:21-78:2.   When Elgie knocked on the door somebody came to the door asking who was there and Elgie announced his name.   Id. at p. 78:14-21. Although Elgie did not know who answered the door initially, he later learned it was Lester Waters.[8]   Id. at pp. 78:23-79:3.   David testified Elgie knocked until

_____

[8]Later witnesses testified Garrett Waters answered the door.   The court finds Elgie was mistaken on this point.   This mistake does not affect Elgie's overall credibility.

someone opened the door and closed it again.   Id. at p. 183:11-15.   David and Elgie both knocked until eventually someone opened the door and let them in. Id. at p. 183:15-18.   Nona entered after Rico and David because she was scared about what happened earlier.   Id. at p. 133:13-20.

David observed Garrett sitting on the couch with Lance Leftwich, Alyson Caldwell, Tammy Eagle Bull and another man whom David understood to be the defendant sitting at the table.   Id. at pp. 80:23-81:11 and 184:18-24. Elgie saw Waters sitting behind the table in the corner of the room.   Id. at pp. 79:25-80:2.

As the Iron Bears were standing around, Tammy began arguing with Nona so she walked back toward the door and stood next to David.   Id. at p. 134:3-5.   Tammy motioned for Nona to go into the laundry room.   Id. at pp. 135:25-136:6 and 187:3-9.   In the laundry room, Tammy was calling Nona names and choking her.   Id. at p. 136:9-10.   Nona fought back, kicking at Tammy until Elgie walked in and pulled Tammy away.   Id. at p. 137:1-7. David could not say whether Elgie broke up the argument, but David did see him at the laundry room door.   Id. at pp. 202:23-203:8.

According to David, the two women apparently resolved their argument because Tammy went back to the table and Nona stood by Rico and David.   Id. at p. 188:4-5.   Somebody introduced the defendant to everyone and he shook hands with Elgie.   Id. at p. 188:6-10.   David described the situation as everyone was "getting along pretty good."   Id. at p. 188:14-15.

7

As Elgie stood by the table talking to Lance, everyone seemed calm.   Id. at pp. 82:20-83:3.   Elgie asked Lance if he was ready to go and Lance indicated yes.   Id. at p. 83:6-10.   After everyone visited for about five minutes Elgie asked to use the bathroom.   Id. at pp. 83:18-84:3.

During the daytime hours of January 24, Charles Janis was in Red Cloud Village for the burial of his girlfriend's nephew.   Id. at p. 156:13-18. After the services Charlie[9]  began to drink and continued to do so until after midnight.   Id. at p. 157:7-12.   After getting into an argument with his girlfriend, Charlie went to Loren's house to use the telephone to call for a ride. Id. at p. 158:6-7 and 19-20.   Charlie told the jury he was pretty drunk that night.   Id. at p. 160:19-20.

At Loren's house, Charlie knocked and went inside like he always had before.   Id. at p. 161:14-21.   When Charlie had been drinking, it was not uncommon for him to spend the night on Loren's couch.   Id. at p. 170:12-17. Charlie knew the defendant because they drank together at Loren's house about a week earlier.   Id. at p. 165:10-15.

Nona testified Charlie Janis came through the front door and went directly to the table where everyone was sitting.   Id. at p. 138:2-12.   Nona said Charlie and one of the men at the table were yelling at each other.   Id. at

---

[9]The lay witnesses call Mr. Janis "Charlie," so the court will use that name to identify the witness throughout this order.

8

p. 138:18-21.   David testified Charlie came in the front door and began looking through all the rooms for someone.   Id. at p. 189:3-9.   Charlie stopped at the table and asked where "she" was at and "I thought you said that she was here." Id. at p. 189:9-11.

Lance asked Charlie for a ride.   Id. at p. 162:11-13.   Because Charlie was mad, he hit Lance, who fell off his stool.   Id. at p. 162:15-17.   As Charlie bent down to hit Lance again, the defendant stood up and shot Charlie in the face.   Id. at p. 162:18-19.   David said after Charlie struck Lance, Waters "pulled out his gun and started shooting."   Id. at pp. 189:23-190:5.   To David, it looked like Waters shot Charlie in the neck and face.   Id. at p. 190:8-16.

As Elgie came out of the bathroom, he saw Charlie and Lance standing together arguing and Elgie heard someone say "[h]e's got a gun. . . . And everyone started running for the back door."   Id. at pp. 84:8-10 and 88:20-23. Nona heard gunshots, David ran out the door and she followed him.   Id. at p. 139:8-11.   David said he pushed Nona out the door.   Id. at p. 190:20-21.

As Elgie started to turn around he saw a flash and got shot in the back. Id. at p. 84:16-18.   After the first shot, Elgie was paralyzed, his legs gave out and he fell on his back.   Id. at p. 85:16-20.   As she left, Nona looked back and saw the defendant leaning over the table, pointing his gun downward at Elgie. Id. at p. 139:12-19.

Elgie remembers being shot two more times.   Id. at p. 85:24.   One bullet entered his right bicep and exited the other side of his arm.   Id. at

9

p. 86:11-18.   That bullet entered Elgie's chest, collapsing his lung.   Id. at

p. 86:18-20.   As he laid on the floor, Elgie thought he was going to die.   Id.

at p. 86:25-87:1.   There is no doubt in Elgie's mind that Waters shot him.   Id.

at pp. 92:18-93:1.

David saw more flashes and estimates three or four shots were fired.   Id.

at p. 192:0-13.   As David looked back, it appeared as though Waters shot

Elgie a couple times.   Id. at p. 192:2-5.   Once outside, David told Rico to go

back inside and get Elgie.   Id. at pp. 140:3 and 194:19-195:10.   Rico went

inside and came out dragging Elgie.   Id. at p. 140:4-5.   Rico said "[t]hey shot

him.   He's hit."[10]   Id. at p. 140:5.   As he was lying on the floor, Elgie

remembers Rico grabbed him by the arm, pulled him up and took him outside.

Id. at p. 87:10-21.   Once Elgie was outside, David got the truck keys out of

Elgie's pocket and they put Elgie in the back of the cab.   Id. at p. 195:20-21.

As Rico and David put Elgie in the pickup he was bleeding.   Id. at p. 140:6-8.

Elgie could not help them because he had no feeling in his legs.[11]   Id. at

p. 140:8-10.   David drove Elgie to the Pine Ridge ER.   Id. at pp. 87:23,

140:13-19 and 196:3-8.

---

[10]The court finds this declaration by Rico was an admissible excited utterance under Fed. R. Evid. 803(2).

[11]The court finds this description by Nona was an admissible present sense impression under Fed. R. Evid. 803(1).

Elgie testified Rico, David and he never threatened or advanced on the defendant while he was sitting at the table.   (Docket 180 at p. 89:1-17). David told the jury that Rico, Elgie, Charlie and he did not have a gun or a knife that night.   Id. at pp. 193:17-194:10.

After being shot, Charlie stood up, his jaw hurt and his mouth was filling up with blood.   Id. at p. 167:6-8.   As Charlie described it, a bullet exploded into his jaw, took out a couple teeth, tore through his tongue and exited the other side of his jaw.   Id. at p. 168:9-11.   His ears were ringing as he walked to the bathroom to look at his tongue.   Id. at p. 167:14-16.   In the bathroom, Charlie slipped on a pool of his own blood and fell.   Id. at p. 167:16-17.   After leaving Loren's house, Charlie walked toward the old hospital where an Oglala Sioux Tribe Department of Public Safety ("OST") Officer picked him up.   Id. at p. 169:5-12.

OST Officer Alec Morgan was dispatched to the Waters' residence in the early morning hours of January 25, 2018.   (Docket 181 at pp. 107:23-24 and 108:5-7).   As he approached the area, he observed OST Officer Jess Jack in his patrol car and a man walking toward him, bleeding severely from his jaw. Id. at pp. 108:24-109:15.   Officer Jack drove the man to the Pine Ridge ER. Id. at pp. 109:13-15.

On the morning of January 25, OST Officer Charles Hunter was dispatched to the Pine Ridge hospital.   Id. at pp. 122:8-15 and 123:10-13.   In a trauma room he made contact with Charlie Janis.   Id. at p. 125:5-7.   Officer

11

Hunter observed that Charlie's "chest was covered in blood . . . he had a large wound to the right side of his face and his cheek was swollen up."   Id. at p. 125:9-11.   Charlie identified the shooter as "Lester Bull."[12]   Id. at p. 125:12-15.

On his way to the Waters' residence Officer Morgan met two women, one of whom was on a cell phone speaking with Loren.   Id. at pp. 110:23-111:21. Officer Morgan took the cell phone and Loren told the officer that the defendant was still in the house with a gun.   Id. at p. 111:22-23.

As Officer Morgan approached the house, the defendant came out to the porch.   Id. at p. 111:23-24.   When the officer asked where the gun was, Waters said it was in his back pocket.   Id. at p. 112:9-11.   OST Officer Danny Conroy approached Waters and removed the firearm.   Id. at p. 112:13-16.

Once inside the house, Officer Morgan noticed it appeared to have been cleaned up, with the trash cans placed behind the house out of sight.   Id. at p. 117:3-10.   Both Garrett and Alyson appeared to be intoxicated.   Id. at p. 117:13-23.

When Officer Hunter arrived at the Waters' residence, the defendant was placed in the back seat of his patrol unit.   Id. at p. 112:22-23.   Officer Hunter thought Waters had a strong odor of an alcoholic beverage about him, he had slurred speech, was sweating and was acting paranoid, which to the officer

---

[12]The government never clarified if Lester Waters was also known as Lester Bull or was a member of the Bull family.   The defendant did not make an issue of this declaration.

indicated drug intoxication.  <u>Id.</u> at pp. 131:19-132:2.   Officer Hunter's patrol

unit has a backseat video camera.  <u>Id.</u> at p. 127:18-20.   The defendant's

actions and words were captured by the video system.  <u>Id.</u>

While sitting in the patrol unit Waters asked Officer Morgan to come talk

to him.  <u>Id.</u> at p. 113:18-21.   When Officer Morgan approached, Waters

appeared to be "sweaty, agitated, showed elements of intoxication, slurred

speech, the odor of alcoholic beverage.   He appeared . . . to be impaired."  <u>Id.</u>

at p. 114:10-12.   Waters explained he was worried for the person he shot and

may have killed.  <u>Id.</u> at p. 114:1-3.   Waters was adamant he was protecting

himself and his family.[13]  <u>Id.</u> at p. 119:20-24.

Officer Hunter's patrol unit video recording was played for the jury.

Trial Exhibit 40.   Without intending to diminish the importance of all the

defendant's statements while in Officer Hunter's vehicle, the court finds the

following statements most pertinent to the issues before the court.[14]

> Here comes Charlie Janis.   Kicked the door in and he, them people
> that were in there . . . Charlie Janis starts f\*\*king up . . . Lance.

> Them people come f\*\*king through that door and they start firing
> back at us.   You know, they start, I shot the guy, yeah I did.   I
> killed him in self-defense.

---

[13]All of the defendant's statements to Officer Morgan and his other
voluntary declarations were recorded on OST Officer Hunter's patrol unit's
video system.

[14]The court incorporates the defendant's statements without reference to
the particular time the statements were made on the recording.   Capitalization
at the beginning of a sentence and periods at the end of a statement are
included where necessary without brackets.

I just stood my f**king ground.   I had to do what I had to do. Charlie didn't get shot.   He got f**king . . . . He got stabbed by them f**kers.

Charlie . . . didn't get . . . shot, he got stabbed by them f**king Elgin Three Irons.

F**king five different, f**king Mexicans walked in the door and here come f**king Charlie. . . . Kicked the door in and walked in and spooked them so they f**king stabbed him and f**k, pretty soon I jumped in.

I plead the fifth it's self-defense.   Go look at the door where they kicked it in.

I put one bullet down the toilet bowl.

I shared meth with Allison.

I didn't shoot f**king Charlie.   They f**king stabbed Charlie. Charlie came in here and started busting up Lance.

Self-defense.   We try to clean our scene up but it's self-defense. They f**king clipped that cord before.   They knew what the hell was going to go on.

I flushed one.   I only had four of them in there.   And I threw one in the, um, laundry room.

Charlie come in there.   Come in there and f**king start raiding house.   Start shooting up Luge.   They f**king surprised them. . . . They shot at, they shot Charlie in the face or stabbed him.

I said, get the f**k out of here.   I let a round fly in the sky.

I did kill that guy and I don't know if the Mexicans loaded him up and headed out, but you go hunt down that Warrior girl.

We were f**king sleeping, man.

I did not shoot Charlie Janis.

Id.

14

Bureau of Indian Affairs Special Agent ("S.A.") Darrell Robinson was
called at 4:10 a.m. on January 25 about a shooting at the Loren Waters'
residence.   (Docket 181 at p. 19:2-25).   At the scene, S.A. Robinson took
photographs and collected evidence.[15]   Id. at p. 20:17.   A shell casing was
recovered on a rug just inside the front door.   Id. at p. 25:23-24.   A second
shell casing on the floor near the table was taken into evidence.   Id. at p. 27:5-
9.

S.A. Robinson did not find any bullet holes in the ceiling or the floor of
the house.   Id. at p. 49:20-25.   His investigation did not find a telephone cord
which had been clipped or where the phone was torn from the wall.   Id. at
p. 50:1-13 (referencing Trial Exhibit 20).   According to the OST dispatch log,
S.A. Robinson counted six calls from the Waters' telephone after the shooting.
Id. at pp. 50:17-51:20.

During cross-examination, S.A. Robinson told the jury the defendant was
adamant he acted in self-defense.   Id. at p. 68:22-25.   After the shooting,
Waters stayed in the house until law enforcement arrived.   Id. at p. 72:22-24.
He surrendered and gave to the officers the gun he used during the shooting.

---

[15]For purposes of this summary the court finds it is unnecessary to
reference the large number of photographs taken at the Waters' residence and
displayed to the jury.

Id. at p. 72:22-73:7.   Waters claimed the Iron Bears came into the house to harm him.[16]   Id. at p. 77:1-3.

According to S.A. Robinson, Lance Leftwich reported he had been assaulted at the Waters' house and Lance could see why the defendant responded the way he did.   Id. at p. 79:11-18.   Lance told law enforcement the Iron Bears did not have any weapons on them.   Id. at p. 82:2-4.

When S.A. Robinson told the jury he had not reviewed the law enforcement interview of Charlie Janis, defense counsel asked the officer to read a portion of Charlie's interview to the jury.[17]   The statement contained the following:

> Janis said he got to the Waters residence.   He walked in and saw Lance Leftwich, who asked him for a ride.   When Leftwich asked for a ride, Janis responded with, "Why the f**k would I give you a ride," and punched him [Leftwich].

Id. at p. 106:4-8.

Later at the Pine Ridge ER, an OST Officer asked Nona her name and she told him "Niya Brewer."   (Docket 180 at pp. 140:22-141:3).   Nona told the jury she gave a false name because she thought there might be a warrant for her arrest.   Id. at p. 141:6-7.   During cross-examination, Nona admitted when she

---

[16]It is unclear from the examination of S.A. Robinson when these statements by the defendant were made.

[17]The court cautioned the jury that Mr. Janis' out of court statement was not admitted for the truth of the statement, but rather whether this statement was "consistent or inconsistent with Mr. Janis's trial testimony."   (Docket 181 at pp. 106:20-107:6).

was interviewed at the scene, then at the ER and later by federal agents, she told each of them she did not see any drugs the night of the shooting.   Id. at pp. 143:23-144:20.   Nona admitted not telling law enforcement about her confrontation with Tammy or that Elgie came to her rescue.   Id. at pp. 145:5-15 and 151:9-15.   Nona told the jury she lied to law enforcement because she was scared.   Id. at p. 151:15.

On January 29, 2018, the defendant was interviewed by S.A. Robinson and S.A. Ted Thayer at the Pine Ridge Adult Offender Facility.   The interview was recorded and played in open court.   Trial Exhibit 43.   Again, without intending to underemphasize other portions of Waters' interview, the court includes the following statements by the defendant as most pertinent to his motion for new trial.[18]

> Them guys come walking in the door. . . . I just sat there and that guy come up and, do you know who I am?   Do you know who the f**k I am?   I said, I don't know who you are.   Man, I don't want no trouble.
>
> About four of them come in.   One waited, two of them waited outside.   So it was her and four other guys walked in.
>
> I said, f**k, I don't want no f**king trouble.   I don't want no trouble. And I was still sober.
>
> F**king, pretty soon, f**king boom!   The door flew open and Charlie come in and started, f**k, and pretty soon they all started coming towards us and I f**king started shooting in the air.   Shot in the air at first.   I shot this way and Charlie must have ran into it and went

---

[18]The court incorporates Waters' statements without reference to the particular time the statements were made on the recording.   Capitalization at the beginning of a sentence and periods at the end of a statement are included where necessary without brackets.

this way.   So I tried, I kept shooting, get the f**k out of here, get the f**k out of here!   And they all scattered.   I didn't know I shot that other guy.

[Charlie] kicked the door open.   Scared them guys. . . . F**k, he said, where the f**k are my kids?   Where the f**k are my kids?   They f**king got them hostage up?   And starts beating up Lance.

Pretty soon them other guys start f**king coming.   I don't even know who these other guys are man.   I never saw them a day in my f**king . . . .

[Did you see any guns or anything like that?]   No, I just reacted. Pulled my gun out and started shooting, but my gun is registered and everything.

I let one fly in the air just to back everyone off, but they kept coming. I went this way and Charlie must of went running this way and must have got him running back into the bathroom.
I heard they had guns. . . . just scared them before they could scare me. . . . Saw knives flying around there, but I didn't think nothing of it.

[Charlie] he wouldn't sit still and pretty soon he just got knife and stabbed Garrett.   I let him go.   I didn't want to get stabbed.

I think that girl said she might have flushed something down the toilet.

We did a pill. . . . I didn't see no meth. . . . We did a line of f**king hydro, that was it.

Id.

MEDICAL AND EXPERT TESTIMONY

Dr. Robert Miller, a board-certified general surgeon, and a trauma team

met Elgie at the Rapid City Regional Hospital ("Regional Hospital").   (Docket

180 at pp. 211:22-25 and 212:25-213:13).   Elgie's drug screen at Regional

Hospital "was positive for methamphetamine, amphetamine, and THC," as well as benzodiazepine.   Id. at pp. 221:20-222:1.

Dr. Miller performed a laparotomy, opening Elgie's abdomen.   Id. at p. 215:22-23.   He observed a "through-and-through injury through the mid part of the small intestine, and an injury to the mesentery, which is where the blood supply to the small intestine is."   Id. at p. 216:6-9.   After repairing those injuries, Dr. Miller discovered a large hematoma (collection of blood) "[i]n the retroperitoneal space . . . where the aorta, the large artery that supplies the body and the vena cava, which is the large vein that returns the blood . . . as well as the kidneys and their blood supply."   Id. at p. 216:15-25.   There was also "a tangential injury to the duodenum, the first part of the small intestine, and that was repaired with sutures."   Id. at p. 218:2-4.   While closing Elgie's abdomen, Dr. Miller discovered and removed a "bullet fragment that was within the right side of the abdominal wall."   Id. at p. 218:10-12.

In addition to those injuries, Dr. Miller testified Elgie suffered two wounds to his right upper arm, likely one entrance wound and one exit wound, and a wound into his chest cavity.   Id. at p. 223:13-18.   In Dr. Miller's opinion Elgie suffered three, possibly four gunshot entry wounds.   Id. at p. 225:24-226:5.

Post-surgical CT scans identified a fracture of Elgie's lumbar spine at L3. Id. at pp. 218:23-219:1.   Elgie was transferred to Denver for surgery.   Id. at

19

p. 219:17-19.   Elgie woke up in critical condition in an intensive care unit of a hospital in Denver, Colorado.   Id. at p. 90:15-16.   He required cardiovascular surgery to repair his aorta and the surgeon was unable to remove the bullet next to his heart.   Id. at pp. 90:21-91:8.   Elgie required a gall bladder reconstruction and spinal surgery at L3.   Id. at p. 91:11-17.   According to Dr. Miller, Elgie remained in Denver for several weeks, had "a prolonged course of antibiotics" and required physical rehabilitation in an effort "to recover any neurologic function . . . as far as the lower extremities and the bowel and bladder function" before being released to return home.   Id. at p. 220:11-22.

At the time of trial, because of the injury to his spine, Elgie had only a little feeling in his right leg and no feeling in his left leg.   Id. at pp. 91:25-92:2. He cannot walk and probably never will.[19]   Id. at p. 92:4.   As a result of the gunshot wounds, Dr. Miller opined Elgie's injuries were both life-threatening and permanent.   Id. at pp. 223:22-224:2.

Dr. Troy Howard is a board-certified otolaryngologist and his specialty includes neck surgery, encompassing plastic surgery and reconstruction.   Id. at p. 5:5-12.   He is associated with the Rapid City Medical Center and affiliated with the Regional Hospital.   Id. at p. 5:13-17.   Dr. Howard and Dr. Irony Sade, a trauma surgeon, saw Charlie Janis in the Regional Hospital ER. Id. at p. 8:12-21.   Charlie had been transferred by air ambulance from the

---

[19]Elgie testified from his wheelchair and is a paraplegic, retaining the use of his upper body and arms.

Pine Ridge hospital.   Id. at p. 8:6-9.   Before transfer, Charlie's airway was maintained with a breathing tube.   Id. at p. 9:21-22.   Upon arrival at Regional Hospital, Charlie's immediate medical needs included the following: control of the bleeding from his mouth, closure of the gaping wounds in his neck and face area, resolution of a hematoma in his neck and repair of a jaw fracture.   Id. at pp. 9:23-10:2.   Charlie's tongue was also severely injured.   Id. at p. 10:16-17.

Dr. Howard observed a clean bullet entry point on the right side of Charlie's face and the left side wounds were more indicative of a bullet exit wound.   Id. at p. 10:23-11:1.   Dr. Sade agreed with Dr. Howard's bullet entry and exit wound analysis.   Id. at p. 11:3.

A CT scan disclosed a bullet fragment.   Id. at p. 11:11-17.   Once Dr. Howard concluded the bleeding in Charlie's neck did not involve major arteries or veins, a decision was made to not attempt recovery of the bullet fragment. Id. at pp. 11:20-12-1.

After controlling Charlie's neck bleeding, Dr. Howard completed a tracheostomy tube replacement.   Id. at p. 12:1-7.   Because of Charlie's jaw fracture, the intubation tube was moved from his mouth to his neck area.   Id. at p. 12:13-18.   This allowed longer-term airway stabilization which would not be impacted by inflammation of his tongue, head and neck areas.   Id. at p. 12:19-22.   Dr. Howard concluded the largest bullet fragment appeared to be in Charlie's left cheek or the parotid gland area.   Id. at p. 13:3-5.   Dr. Howard felt it was important to recover this bullet fragment, close the wound and

determine whether any nerve injury occurred.   Id. at p. 13:7-9.   Most likely at risk were the facial nerves and a cranial nerve which control facial movement. Id. at p. 13:12-13.

Because the injuries to Charlie's mouth were more extensive than the injuries to his external cheek, Dr. Howard chose to proceed through Charlie's mouth to explore the wound and recover the bullet fragment.   Id. at p. 13:24-14-3.   The jagged edges of the bullet fragment could potentially cause a mechanical injury to the surrounding tissues, so it was important to remove all bullet fragments which could be retrieved.   Id. at p. 14:9-13.   Two of the larger bullet fragments removed were identified by Dr. Howard and admitted as Trial Exhibit 47.   Id. at p. 15:19-16:12.

After closing Charlie's cheek wound, Dr. Howard focused on the severe laceration of Charlie's tongue.   Id. at p. 17:7-14.   Dr. Howard concluded a bullet took out approximately two-thirds of the visible portion of Charlie's tongue.   Id. at p. 17:14-22.   Dr. Howard opined the bullet passed through the jawbone, fragmented and was very destructive to the soft tissue of Charlie's tongue.   Id. at p. 18:4-16.   To recreate a remnant of Charlie's tongue, Dr. Howard started with a deep layer of absorbable stitches followed by a superficial layer of absorbable stitches.   Id. at p. 19:5-10.   When Dr. Howard saw Charlie for a follow-up clinical visit, his tongue had several rough edges and gross scar tissue as opposed to a normal smooth, fluid and freely moving tongue.   Id. at p. 20:18-24.

22

Dr. Ike Morgan, an oral surgeon at Regional Hospital, repaired Charlie's jawbone.  Id. at p. 22:19-23.   The surgery required removal of two of Charlie's teeth and his remaining teeth needed to be properly aligned so his jaw could be wired into position.   Id. at p. 23:13-21.   The fracture of the left mandible was repaired with a titanium plate and screws.   Id. at pp. 23:22-24:1.   Because of the severity of the damage to Charlie's right mandible, Dr. Morgan was unable to do any plating or other reconstructive surgery.   Id. at p. 24:2-12.

With a surgically wired jaw, surgically repaired tongue and tracheostomy tube, Charlie required a feeding tube.   Id. at p. 25:15-19.   The feeding tube was placed through Charlie's abdomen and into his stomach to permit feeding for an extended time period.   Id. at p. 25:1-26:2.

Charlie was transported by air ambulance to a Billings, Montana, hospital.   Id. at p. 169:23-25.   In Billings, Charlie had further reconstructive surgery to his jaw and tongue.   Id. at p. 170:1-3.

Dr. Howard testified several of Charlie's injuries are permanent.   Id. at pp. 27:2-28:1.   Most prevalent injuries are chronic pain associated with his jaw and tongue injuries, which will create difficulties with speech, language, chewing and swallowing.   Id. at p. 27:15-18.   At trial, Charlie spoke with a thick, slurred form of speech, which was difficult to understand at times.

Mateo Serfontein, a former employee with the state forensic laboratory in Pierre, South Dakota, testified.   Id. at p. 229:11-18.   Mr. Serfontein has an extensive background in forensic firearms examinations.   Id. at pp. 229:22-

230:10.   He is a member of the National Association of Firearm and Tool Mark Examiners.   Id. at p. 230:5-7.

Mr. Serfontein received a 9mm Luger caliber, model SR9, semiautomatic pistol for examination in this case.   Id. at p. 233:12-13.   He also received two 9mm Luger caliber fired cartridge cases, two fired bullets, lead fragments and one fired bullet jacket fragment.   Id. at p. 233:8-12.

Using a comparison microscope, Mr. Serfontein compared the two fired cartridge cases with cartridge cases obtained from his test-firing of the 9mm Luger.   Id. at p. 239:16-19.   In his professional opinion, the spent cartridge cases were fired from the 9mm Luger.   Id. at p. 239:22-24 (comparing Trial Exhibits 45 and 46 with Trial Exhibit 49).

Regarding the bullet fragments recovered from the bodies of Charlie Janis and Elgie Iron Bear, Mr. Serfontein opined the bullet fragments could have been fired from the 9mm Luger but "due to the damage to the bullets, there wasn't enough individual characteristics for me to determine with certainty if they were fired from this weapon."   Id. at pp. 242:2-11 & 244:4-7 (referencing Trial Exhibits 47 & 48).

Government counsel, defendant and his attorney stipulated to the testimony of Forensic Scientists Tayler Ripley and Stacie Smith of the South Dakota Forensic Laboratory in Pierre, South Dakota.   (Docket 181 at p. 143). From samples delivered to the laboratory, Mr. Ripley identified blood on the kitchen floor and bathroom floor of the Waters' residence, blood on the

24

defendant's pants and both of his shoes.   Id. at p. 143:19-24.   Mr. Ripley also collected swabs from the 9mm Luger pistol.   Id. at p. 143:25.

Comparing DNA samples from the defendant, Charles Janis and Elgie Iron Bear, Ms. Smith discovered:

1. DNA taken from the swabs of the pistol matched the DNA profile of the defendant;

2. DNA taken from the blood on the kitchen floor, the bathroom floor, defendant's pants and the soles of both of defendant's shoes matched the DNA profile of Charles Janis; and

3. DNA taken from the blood on the sole of the right shoe of the defendant matched the DNA profile of Elgie Iron Bear.

Id. at p. 144:2-25 (referencing Trial Exhibit 2).

The defendant, his attorney and government counsel also stipulated Lester Waters, Jr. is an Indian person and the alleged incident, if it occurred, was in Pine Ridge, South Dakota, in Indian country.   (Docket 180 at p. 18:13-24; see also Trial Exhibit 1).

DEFENSE TESTIMONY

The defendant presented four witnesses in his case.[20]   Loren Waters was the defendant's second witness.   (Docket 182 at p. 7:21-23).   The defendant is

---

[20]The first witness was Ron Switzer a private investigator from Rapid City.   (Docket 182 at p. 4:4-8).   During his interview of Charlie Janis, Mr. Switzer made it clear he was not Mr. Waters' attorney but a private investigator working for the defendant.   Id. at p. 5:10-15.   During Mr. Janis' testimony, he seemed confused as to whether Mr. Switzer was an attorney or private investigator.   The court finds this was not a significant issue concerning Mr. Janis' credibility.

Loren's first cousin.   Id. at p. 30:20-21.   Twice on January 24, 2018, the

defendant came to Loren's house.   Id. at p. 8:15-24.   The second time he

asked to spend the night because he had been drinking.   Id. at p. 8:25-9:2.

Loren asked the defendant to watch the house that evening because Loren was

sick, taking cold medicine and going to bed.   Id. at p. 9:7-14.   When Loren

went to bed, Wilkes 20-50024 #16, Garrett, Nona and Alyson were there.   Id.

at p. 10:1-2.

When Loren got up sometime later, the defendant, Alyson, Lance and

Garrett were still at the house.   Id. at p. 12:21-22.   Garrett was passed out on

the couch.   Id. at p. 12:22-24.   Loren went back to bed and later woke up to

gunshots.   Id. at p. 13:25.   When Loren entered into the living room, he saw

the front door open and a man lying inside the house by the door.   Id. at

p. 15:19-21.   As Loren looked around the room, a big man he later learned

was Rico Iron Bear came in the front door.   Id. at p. 16:8-10.   When Rico saw

Elgie lying on the floor Loren said "[t]ake him.   I don't know what the hell you

guys are doing up here."   Id. at p. 16:11-13.

Loren intended to call 9-1-1 but first had to plug the phone into the wall

receptor.   Id. at pp. 16:23-17:8.   As Charlie Janis came out of the bathroom

his mouth was bleeding.   Id. at p. 18:1-3.   Charlie was more like a brother

than a friend to Loren.   Id. at p. 24:22-23.   While helping Charlie, Loren

asked Alyson to wipe up the blood.   Id. at p. 18:4-5.   According to Loren, the

defendant did not help clean up the house.   Id. at p. 27:14-17.   After waiting

26

30 to 45 minutes for an ambulance to arrive, Charlie left and started walking down the road.   Id. at p. 19:13-16.

When law enforcement finally arrived, the defendant joined Loren on the porch.   Id. at p. 20:4-5.   The officers had Waters put the firearm in his back pocket, walk down the porch ramp and get on his knees.   Id. at p. 20:13-15. He was handcuffed and led away.   Id. at p. 20:16-17.

Defense counsel asked permission to present to the jury Lance Leftwich's recorded statement to law enforcement.[21]   Id. at p. 32:16-17.   The court found the statement admissible under Fed. R. Evid. 807 because Lance was an unavailable witness.[22]   Lance's statement was not under oath but he reported to law enforcement the following information.[23]

Lance got to Loren's house between 11 p.m. and midnight on January 24.   Id. at p. 57:15.   The defendant, Garrett, a girl by the name of Caldwell and another girl Lance did not know were in the house.   Id. at

---

[21]Lance Leftwich was subpoenaed to appear for trial and the government was looking for him.   (Docket 181 at p. 95:2-4).   Because of the witness' failure to appear, the court granted the government's motion for a material witness warrant.   Id. at p. 103:15-22.   Mr. Leftwich was never located.

[22]The court addressed the criteria for admissibility of a statement under Fed. R. Evid. 807.   (Docket 182 at pp. 37:6-38:7 & 38:18-24).   With the assistance of counsel, the court redacted portions of the statement.   Id. at pp. 46:2-51:11.   The court explained to the jury why a transcript of the statement was being read and how the jury was to consider the testimony.   Id. at p. 54:20-55:8.

[23]The court presents Lance's statement out of chronological order but in the same sequence in which law enforcement asked questions.

pp. 57:19-58:12.   Defendant kicked the other girl out of the house after they began arguing.   Id. at p. 58:20-24.

Tammy Eagle Bull joined the group in the house and they sat at the table visiting for about two hours when that same girl showed up again.   Id. at p. 59:6-19.   According to Lance, the girl was "with Elgie and about three other guys."   Id. at p. 59:10-11.   Tammy and the other girl start arguing so they went to the back of the house.   Id. at p. 59:20-22.

Later, according to Lance, Charlie Janis came in the house "[a]nd he's bitching around about where's his girlfriend, where's his girlfriend?"   Id. at p. 60:1-2.   When Elgie and the others came in, Lance knew them and did not see them carrying any bats, guns, knives or any other weapons.   Id. at pp. 61:22-22 and 62:11-13.

Charlie struck Lance.   Id. at p. 62:22.   Lance told Charlie "[w]e don't have her out here."   Id. at p. 63:4-5.   Lance was talking to the Caldwell girl at the table when he heard gunfire.   Id. at p. 65:7-8.   Lance put his head down because he did not want to get hit.   Id. at p. 65:8-9.   Lance heard Tammy yelling "get the f**k out."   Id. at p. 65:12-13.   Lance ran from the house and hid behind Elgie's pickup.   Id. at p. 65:22.

When Elgie's group came in, they were not yelling or arguing.   Id. at p. 68:6.   Lance did not know the guy who sat down at the table and started visiting, so Lance asked his name but could not remember the name.   Id. at p. 68:8-9.   Lance did not see anyone using methamphetamine that night.   Id.

28

at p. 69:19.   The girl with Elgie's group was "running her lips to [the defendant]."   Id. at p. 70:23-25.   Lance was not paying attention to what she was saying because he "was trying to stay out of other people's problems."   Id. at p. 71:2-3.

Lance was "looking at Charlie, because you remember I told you he swung at me and hit me because he was looking for his woman."   Id. at p. 71:11-13.   Lance "was just trying to chill him out.   'Hey she's not here[.]' " Id. at p. 71:14-15.

Lance did not see anyone with a gun "not one person have [sic] a gun." Id. at p.71:19-20.   As soon as Lance heard shots he was trying to get out of the house.   Id. at pp. 71:25-72:1.   He was "not going to sit [here] and argue if someone has a gun on them."   Id. at p. 72:6-7.

Lance knew Elgie and his little brother, David, but he did not know the third man.   Id. at p. 72:23-24.   Lance denied having a gun, knives, bats or sticks that night.   Id. at pp. 73:24-84:1.

After Charlie hit Lance, his nose bled a little bit.   Id. at p. 74:7-8.   Lance remained sitting after being struck.   Id. at p. 74:13-14.   Lance did not hear the defendant say anything, he just sat in a chair and music was playing.   Id. at pp. 74:22-75:4.

Before everyone got there, Lance visited with the defendant because they had been friends since Waters was a young boy in baseball and Lance was a coach.   Id. at p. 76:6-10.   Lance thought Waters was "buzzed up."   Id. at

29

p. 76:14.   On a drunkenness scale, Lance thought Waters was a "[s]ix or seven," but Lance did not hang around much with Waters to know how drunk he got.   Id. at p. 76:18-20.

The government, the defendant and his attorney stipulated Lance Leftwich had three misdemeanor convictions for false impersonation to deceive law enforcement: the first in 1995, the second in 2004 and the third in 2018. Id. at pp. 79:24-80:6

The defendant testified.   Waters acknowledged that on January 24 he was in possession of the 9mm Luger and four bullets.   Id. at pp. 85:23-25 and 86:23-24.   He arrived at Loren's house between 7:30 p.m. and 8:30 p.m.   Id. at p. 88:12-13.   Loren and Garrett were there.   Id. at p. 88:17.   Later in the evening Alyson Caldwell and Nona Warrior came to the house.   Id. at p. 89:16-19.   Alyson, Nona and Waters started drinking.   Id. at p. 91:16-17.   Garrett was sleeping on the couch and Loren was in bed.   Id. at p. 91:20-24.

About 30 minutes later, Lance Leftwich knocked and came in asking for Loren.   Id. at p. 92:2-8.   Lance was looking to see if Loren had received a water bottle.[24]   Id. at p. 92:18-19.   Loren woke up and gave Lance money for the water bottle.   Id. at p. 92:20-21.

Lance, Alyson, Nona and Waters sat and visited for an hour or more.   Id. at p. 93:5-8.   Later, Alyson washed dishes because Waters asked her to do so.

_____

[24]The water bottle was a 12-ounce bottle which had the water dumped out and was filled with vodka.   (Docket 182 at p. 118:11-14).

<u>Id.</u> at p. 93:10-12.   Waters asked Nona to help Alyson, but she refused.   <u>Id.</u> at
p. 93:14.   Sometime later after Nona came out of the bathroom, Waters went
in and saw towels with "human spill on it."   <u>Id.</u> at p. 94:17-19.   When Waters
asked Nona if she had done that, she replied "[f]**k you, you f**king gross
bastard.   I would never f**kng do that sh*t in someone's f**king house."   <u>Id.</u> at
pp. 94:24-95:2.   Waters told the jury an argument ensued, Nona threw a bowl
of cereal at Waters and he threw a water bottle at her.   <u>Id.</u> at pp. 96:13-97:10.
After that, Nona stormed out of the house.   <u>Id.</u> at p. 97:12.   As she was
leaving, Nona said to Waters "[f]**k you, you black bastard.   I'll be back."   <u>Id.</u>
at p. 97:14-15.

After Nona left, Alyson, Lance, Loren, Garrett and Waters played cards.
<u>Id.</u> at p. 98:2-3 and 8-9.   At some point in time, Loren went to bed and Tammy
Eagle Bull showed up about 11:30 p.m.   <u>Id.</u> at p. 98:9-20.   Tammy, Alyson,
Lance and Waters sat around the table drinking.   <u>Id.</u> at p. 99: 8-10.

According to the defendant, around 2 a.m. somebody knocked at the
door.   <u>Id.</u> at p. 100:10-13.   Garrett opened the door and the person outside
said "David."   <u>Id.</u> at p. 101:13-15.   Waters thought "[i]t had to be the Iron
Bear boys."   <u>Id.</u> at p. 101:17.   Because "Loren bootlegs vodka bottles," Waters
said, "Loren needs some money for the light bill."   <u>Id.</u> at p. 101:22-25.   Waters
thought David was there to buy a water bottle.   <u>Id.</u> at p. 102:10-12.

The defendant testified Nona led the Iron Bear boys into the house.   <u>Id.</u>
at p. 102:17.   Nona came over to Waters and said, "[h]ey, why are you f**king

locked, bastard?"   Id. at p. 102:19-20.   Waters told the jury he felt there was trouble coming.   Id. at p. 102:24-25.   Tammy told Nona, "[h]ey, little bitch, [d]on't bring troubles to my cousin's house."   Id. at p. 103:10-11.

As Tammy and Nona were arguing, Waters testified the three guys circled around the girls and "Elgie Iron Bear circles around and tries to get at me." Id. at p. 104:6-8.   Elgie told Waters to get up, demanding "[i]f you're going to fight girls, fight a man."   Id. at p. 106:14-17.   Because Waters did not know Elgie, he said it made him "feel uncomfortable. . . . scared."   Id. at p. 104:13-15.   Waters testified it was at this point David pulled the phone off the wall and cut the cord.   Id. at p. 104:23-25.

Suddenly everyone heard "a loud bang at the door."   Id. at p. 105:8.   In came Charlie Janis, who the defendant knew.   Id. at p. 105:10-18.   Waters told the jury Charlie said "[y]ou got my kids and lady hostage."   Id. at p. 105:23.   Waters pulled the Luger out of his pocket and placed it on his lap. Id. at p. 106:2-3.   Charlie circled the room and assaulted Lance.   Id. at p. 106:21-24.   Waters felt "scared.   Really more scared."   Id. at p. 107:1. Just before shooting Charlie, the defendant testified he jumped up and told everyone to "get the f**k out of here.   You ain't welcome here."   Id. at p. 08:12-14.   Waters shot Charlie "[b]ecause Lance was getting assaulted."   Id. at p. 107:8-11.

The defendant testified at that moment Elgie and the other Iron Bear men came at him.   Id. at p. 107:21-22.   Waters said he shot Elgie because he

was coming at Waters "with full aggression." Id. at p. 108:19-21.   After being shot, Elgie stumbled backwards and Waters ran into Loren's room to have him call the police.   Id. at p. 109:4-8.   Waters told the jury that when he came out of Loren's room everyone was gone except Garret and Alyson, and Charlie was in the bathroom.   Id. at p. 109:18-22.

Waters explained that he put the phone back on the table and called 9-1-1.   Id. at p. 110:22-23.   Alyson started cleaning the floor while Waters waited 20-30 minutes for law enforcement to arrive.   Id. at p. 111:2-4 and 19. When law enforcement pulled up to the house, the defendant walked outside and put his hands in the air.   Id. at p. 111:21-22.

When asked about his comments in the back of the police unit, Waters told the jury "I lied. . . . Everything in that thing [the video] is a lie."   Id. at p. 112:17-19.   When asked about his interview with S.A. Robinson a few days later, Waters said "[t]here's some parts I lied."   Id. at pp. 113:21-114:2. Waters wanted the jury to believe his trial testimony because his earlier statement to law enforcement "was a lie."   Id. at p. 114:6-8.

During cross-examination, the defendant admitted telling S.A. Robinson that earlier in the evening of the shootings he snorted a crushed hydrocodone pill and he also told Officer Morgan he snorted methamphetamine.   Id. at p. 121:5-10.   At trial, Waters told the jury those earlier statements were lies. Id. at p. 121:19-22.

Waters testified he was sitting down when he shot Charlie once and stood up to shoot Elgie twice or maybe three times.   Id. at p. 136:13-19. Waters admitted flushing one of the bullet casings down the toilet and throwing another one into the laundry room.   Id. at p. 134:1-6.

THE VERDICT

In the supplemental jury instructions, the court included an instruction entitled "Defense of Self or Others."   (Docket 148 at p. 13) (some capitalization omitted).   Each of the supplemental instructions for counts I and IV, assault with a dangerous weapon, and counts II and V, assault resulting in serious bodily injury, included a reference to the Defense of Self or Others instruction. Id. at pp. 4, 6, 8 and 10.

The jury returned a verdict finding the defendant guilty of all six counts in the indictment.   (Docket 153).   The crimes of conviction were:

Count I, assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153;

Count II, assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153;

Count III, brandishing and discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii);

Count IV, assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153;

Count V, assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153; and

Count VI, brandishing and discharging a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

(Docket 153; <u>see</u> <u>also</u> Dockets 19, 141 and 148).

## **MOTION FOR NEW TRIAL**

The defendant asserts 17 grounds in his motion for new trial.   (Docket 192 at pp. 3-6).   Presented in defendant's words, those grounds are:

1.   LJ Iron Bear gave a statement to Agent Darrell Robinson about what happened at Loren Water Residence on January 25, 2018.   LJ Iron Bear told the jury that he lied to Agent Darrell Robinson about being sober that night.   Isn't that committing perjury?

2.   Nora Warrior gave a statement Agent Darrell Robinson about what happened at Loren Water's residence on January 25, 2018.   Nora Warrior lied to Officer Charles Hunter at the hospital, saying a different name.   Nora Warrior told the jury she lied to Agent Darrell Robinson and to the jury a different shorty from the interview.   Isn't that committing perjury?

3.   Allison Caldwell and Lance Leftwich didn't show up as they were both subpoenaed for court.   Judge Viken told prosecutor he wanted federal warrants issued for both of them.   But why hasn't the government done this?   They both are still walking around free.

4.   Tammy Eagle Bull gave a cop car video of her statement to Officer Darrell Conroy the night of her arrest that needs to be looked into.   And her statement with Agent Darrell Robinson has never appeared in my discovery or the video was never viewed at all during my trial.

5.   Why was Agent Darrell Robinson statement impeached at trial?

6.   Why was Charles Janis statement impeached at trial by the government?

7.   Why wasn't Lance Leftwich's statement to Agent Darrell Robinson of January 25, 2018 in court?

8.   Why wasn't Lance Leftwich present to tell his story about the night at Loren Waters residence.

9. Was it right for the jury to hear just the transcripts of Lance Leftwich that was read by Robbie Rohl and Investigator Ron Schweitzer? Which I Lester Waters told Robbie Rohl to then stop the trial, but he never did. I feel that is ineffective counsel at my trial, and that violated my Sixth Amendment right to a fair trial?

10. On April 29, 2019 the government didn't produce all record recordings and reports associated with Federal R. Evid. 412, 413, and 415, and experts under Rule 702.

11. When the forensics specialist from Pierre, S.D. testified that the (3) shell casings found at the scene, only (1) shell case matched the gun from Lester Waters Jr.'s.

12. Why didn't the government bring Rico Iron Bear to the stand for cross examination, because he was a big witness.

13. During my arrest on January 25, 2018, I was never read my Miranda[25] Rights?

14. Why wasn't Garrett Waters' statement with Agent Darrell Robinson never got viewed before or at trial?

15. Tammy Eagle Bull was called by telephone by the U.S. Prosecuting Attorney informing her to stay home, because her testimony was not needed at trial? Tammy Eagle Bull was subpoenaed as a defense witness, not by the U.S. Prosecuting Attorney.

16. Allison Caldwell was also called by the U.S. Prosecuting Attorney a few days before trial informing her to stay home because her testimony was not needed at trial. Allison Caldwell was subpoenaed as a defense witness, not by the prosecuting attorney.

17. So why did the prosecuting attorney tell Tammy Eagle Bull and Allison Caldwell to stay home? When they weren't their witness?

---

[25]Miranda v. Arizona, 384 U.S. 436 (1966).

Id. (some minor spelling errors corrected and capitalization included without brackets).   Following Waters' list of challenges, he included a request that the court take "judicial notice of adjudicative facts."   Id. at p. 7 (citing SDCL 19-19-201).[26]   The court will address the defendant's claims in the manner deemed most logical by the court.

ANALYSIS

Perjury

The defendant asserts Elgie Iron Bear and Nona Warrior committed perjury.   (Docket 192 ¶¶ 1 and 2).   Waters argues Mr. Iron Bear's perjured testimony "should have been excluded pursuant to Fed. R. Evid. 403 and Brady v. Maryland, 373 U.S. 83 [1963.]"   (Docket 208 at p. 33).   Waters believes Ms. Warrior's testimony should have been excluded for the same reasons.   Id. at p. 36.

Both witnesses, while under oath at trial, admitted to the jury they had each lied to law enforcement in earlier interviews.   Those prior statements do not constitute perjury.   "A witness commits perjury 'if [he or she] gives false testimony [under oath] concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.' "   United States v. Taylor, 207 F.3d 452, 454-55 (8th Cir. 2000) (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)).

---

[26]The same language cited by the defendant is contained in Fed. R. Evid. 201.

Perjury is also a federal offense.   18 U.S.C. § 1621.

> Whoever . . . having taken an oath before a competent tribunal . . .
> in any case in which a law of the United States authorizes an oath
> to be administered, that he will testify, declare, depose, or certify
> truly . . . willfully and contrary to such oath states or subscribes any
> material matter which he does not believe to be true . . . is guilty of
> perjury[.]

Id. at § 1621(1).   "[T]he essential elements of the crime of perjury . . . are (1) an

oath authorized by a law of the United States, (2) taken before a competent

tribunal . . . and (3) a false statement wilfully made as to facts material to the

hearing."   United States v. Edwards, 443 F.2d 1286, 1290 (8th Cir. 1971)

(internal quotation marks omitted; citing United States v. Debrow, 346 U.S.

374, 376 (1953)).

A statement made by a witness under oath, if proven to be false,

constitutes perjury.   Mr. Iron Bear's and Ms. Warrior's statements to law

enforcement were not under oath.   It is a witness' trial testimony which is the

focus of perjury.   There is no evidence either witness gave false testimony in

court.   During trial, "it is within the province of the jury to make credibility

assessments and resolve conflicting testimony."   United States v. Jefferson,

725 F.3d 829, 834 (8th Cir. 2013) (internal citation omitted).   By its verdict,

the jury found Ms. Warrior and Mr. Iron Bear credible witnesses.   The court

finds the witnesses' candor and explanation for not telling the truth to the

investigative officers credible.   Campos, 306 F.3d at 579.

The defendant's claims are without merit.   Grounds one and two in

support of defendant's motion for a new trial are denied.

<u>Lance Leftwich</u>

The defendant's motion for new trial makes a number of claims regarding Mr. Leftwich.   Those are summarized for purposes of this analysis as:

A.     Material Witness Warrant

Mr. Leftwich was subpoenaed by the government to appear for trial.[27] (Docket 181 at p. 95:2-4).   Because of Mr. Leftwich's failure to appear, the court granted the government's motion for a material witness warrant on May 23, 2019.   <u>Id.</u> at p. 103:15-22; <u>see</u> <u>also</u> Docket 145.   The warrant directed any law enforcement officer to arrest Mr. Leftwich and bring him before the court. (Docket 145 at p. 1).   Mr. Leftwich was not located, arrested or brought to court during the pendency of the trial.   On May 29, 2019, the court issued an order quashing the warrant for the arrest of Mr. Leftwich.   (Docket 158).   The order acknowledged "[t]he trial has been completed and it is appropriate to quash the warrant."   <u>Id.</u>   The defendant's claim regarding the absence of Mr. Leftwich is without merit.   Once the trial was over, Mr. Leftwich could no longer be detained under the court's order so the warrant was quashed. Defendant's third and eighth grounds in support of his motion for new trial as they relate to Mr. Leftwich are denied.

---

[27]Pursuant to defense counsel's *ex parte* motion (Docket 105), the court also authorized the Clerk of Court to issue a subpoena for Mr. Leftwich on behalf of the defendant.   (Docket 137 at pp. 9-10).

B.      Lance Leftwich's Statement

During trial, defense counsel asked the court to permit the jury to hear Lance Leftwich's recorded statement to law enforcement.   (Docket 182 at p. 32:16-17).   The court addressed the criteria for admissibility of a statement under Fed. R. Evid. 807.   Id. at pp. 37:6-38:7 and 38:18-24.   The court found the statement admissible under Rule 807 because Mr. Leftwich was an unavailable witness.   With the assistance of counsel, the court redacted portions of the statement to prevent the jury from hearing irrelevant or unduly prejudicial statements from the witness.[28]   Id. at pp. 46:2-51:11.   Before Mr. Leftwich's statement was presented to the jury, the court explained that a transcript of the witness' statement to S.A. Robinson was being read and explained how the jury was to consider the testimony.   Id. at p. 54:20-55:8.

Contrary to the defendant's seventh ground for a new trial, Mr. Leftwich's January 25, 2018, statement was read to the jury.   Defendant's seventh ground for a new trial is denied.

In his motion for new trial, the defendant now challenges the decision of his attorney to use Mr. Leftwich's statement as trial evidence.   Defendant claims the decision by his attorney to present the statement to the jury was done without Waters' consent and constituted ineffective assistance of counsel in violation of his Sixth Amendment right to a fair trial.   (Docket 192 ¶ 9).

---

[28]An unredacted copy of Mr. Leftwich's statement was not preserved in the record by either the government or the defendant.

Defendant also asserts use of the Leftwich statement violated his right of confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).   (Docket 208 at p. 23).

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' "   <u>Washington</u>, 541 U.S. at 42.   It is the government's use of an individual's out-of-court statement against a defendant which is the gravamen of the Sixth Amendment.   <u>Id.</u> at 68.

Defendant's claims are without merit.   The defendant sought permission to use Mr. Leftwich's statement.   Fed. R. Evid. 807(a) permitted the court to allow the defendant to introduce the out-of-court statement.   There was no error in permitting Mr. Waters to present the statement of Mr. Leftwich to the jury.   When offered by the defendant, the statement does not violate <u>Crawford</u>.

"Normally, a collateral postconviction action under 28 U.S.C. § 2255 is the appropriate means for raising a claim of ineffective assistance of counsel and for developing a record sufficient to examine counsel's performance." <u>United States v. Villalpando</u>, 259 F.3d 934, 938 (8th Cir. 2001) (referencing <u>United States v. Jackson</u>, 204 F.3d 812, 815 (8th Cir. 2000)).   "The district court, however, may consider the claim on a motion for new trial if it has developed an adequate record on the issue."   <u>Id.</u> (referencing <u>United States v. Stevens</u>, 149 F.3d 747, 748 (8th Cir. 1998)).

Contrary to the defendant's unsupported assertion, Attorney Rohl is a member of the Criminal Justice Act panel of attorneys qualified to practice criminal law in the District of South Dakota on a court-appointed basis. Attorney Rohl has been counsel in a number of criminal cases in federal court. Whether Attorney Rohl provided effective counsel to the defendant is an issue better resolved in a proceeding brought under 28 U.S.C. § 2255.

Defendant's ninth ground for a new trial is denied.

Alyson Caldwell

Defendant asserts Ms. Caldwell was subpoenaed as a witness but she failed to appear for trial.   (Docket 192 ¶ 3).   He argues a material witness warrant was ordered by the trial court but she was never arrested.   Id. Additionally, Waters argues Ms. Caldwell was subpoenaed as a defense witness, yet the government interfered and told her not to come to trial.   Id. ¶¶ 16-17.

Defendant's assertions do not match up with the record before the court. On May 6, 2019, defense counsel moved *ex parte* for subpoenas to be issued to a number of witnesses, including Ms. Caldwell.   (Docket 105).   That same day, the court issued an *ex parte* order directing subpoenas be issued. (Docket 118).   A subpoena for Ms. Caldwell was issued on May 7, 2109.   See Docket 143 at p. 1.

Notations by the United States Marshals Service reflect the efforts Deputy Marshals took to obtain service of the subpoena on Ms. Caldwell.   Id.

42

at p. 2.   In addition to making contact with a number of Ms. Caldwell's relatives and acquaintances, the Deputy Marshals communicated with defense counsel and Mr. Switzer, defendant's private investigator.   Id.   The defense team indicated they, too, had been unable to communicate with Ms. Caldwell. Id.   When all efforts failed, a Deputy Marshal returned the subpoena as unexecuted on May 22, 2019.   Id.   The court did not issue a material witness warrant for Ms. Caldwell.

Other than defendant's unsupported assertions, the defendant presents no evidence the government either interfered with getting Ms. Caldwell served or her appearing at trial.   Defendant made no record at trial that Ms. Caldwell was a critical witness who would offer testimony supportive of defendant's theory of the case.   Nor did the defendant present any proffer as to the nature of her testimony, the absence of which would have been prejudicial to the defendant's case at trial.

Defendant's unsubstantiated claims are insufficient to warrant a new trial.   Defendant's third, sixteenth and seventeenth grounds in support of his motion for new trial as they relate to Ms. Caldwell are denied.

Tammy Eagle Bull

Defendant asserts Ms. Eagle Bull gave a statement to OST Officer Darrell Conroy which was recorded on his patrol unit video system.   (Docket 192 ¶ 4). The defendant also submits her statement to S.A. Robinson was not in the pretrial discovery and neither of those two statements were "viewed at all

43

during my trial." Id.  As with Ms. Caldwell, defendant claims the government called Ms. Eagle Bull and informed her to stay home as her testimony was not needed at trial.   Id. ¶ 15 and 17.

On May 6, 2019, defense counsel moved ex parte for subpoenas to be issued to a number of witnesses, including Ms. Eagle Bull.   (Docket 105). That same day, the court issued an ex parte order directing subpoenas be issued.   (Docket 118).  A subpoena for Ms. Eagle Bull was issued on May 7, 2109.  See Docket 136 at p. 1.   Ms. Eagle Bull was served with the subpoena on May 15, 2019.   Id. at p. 2.

In the government's response, an Assistant United States Attorney, as an officer of the court, represents "that Tammy Eagle Bull, Rico Iron Bear, and Garrett Waters were present in the federal courthouse for at least two of the days during trial."   (Docket 224 at p. 8 n.1) (referencing Docket 182 at p. 38:12-14).   The government submits defendant's allegations "that the prosecution told the subpoenaed defense witnesses to 'stay home' is unfounded, and he provides no evidence to support this baseless claim."   Id. at p. 8.

During the colloquy with counsel outside the hearing of the jury regarding the admissibility of Mr. Leftwich's statement, government counsel represented to the court that

> Tammy was in the hall yesterday afternoon.   Garrett Waters was in the hall yesterday afternoon.   Ryan Waters was in the hall.   So was Tyler Waters.   Many of the other same witnesses who observed

44

> the same facts as Lance Leftwich were in the hall yesterday when
> we adjourned[.]

(Docket 182 at p. 38:12-17).

There is nothing in the record following the discussion regarding Mr. Leftwich's statement, or at any time for that matter, asserting any intention by defendant to call Tammy Eagle Bull as a witness.   See Docket 182 at pp. 80:9-12 and 140:17-24.   The court finds defendant failed to present any evidence of misconduct by the government or anything other than a defense strategy not to call Ms. Eagle Bull as a witness at trial.   "The decision not to call witness[es] is a virtually unchallengeable decision of trial strategy."   United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (internal quotation marks and citation omitted).   Whether Attorney Rohl provided effective counsel to the defendant in not calling Ms. Eagle Bull as a witness is an issue better resolved in a proceeding brought under 28 U.S.C. § 2255.

Defendant's fourth, fifteenth and seventeenth grounds in support of his motion for new trial as they relate to Ms. Eagle Bull are denied.

Rico Iron Bear

Defendant asserts the government should have called Rico Iron Bear as a witness so he could have been cross-examined by defense counsel.   (Docket 192 ¶ 12).   Defendant's request for the issuance of a subpoena to Mr. Iron Bear was granted.   (Docket 118) (referencing Docket 105).   The subpoena was served on May 15, 2019, by leaving it at a Manderson, South Dakota, residence.   (Docket 137 at p. 2).   The Deputy Marshals' notation indicates an

45

individual at that residence stated "Rico got the subpoena" on May 17, 2019.
Id.   The individual making that report indicated they would "have Rico call
USMS to say he received subpoena."   Id.

There is no constitutional or statutory rule requiring the government to
call as witnesses at trial every individual who may have been present during an
event which is the subject of a criminal trial.   The Assistant United States
Attorney, as an officer of the court, represented to the court and defense
counsel "that . . . Rico Iron Bear . . . [was] present in the federal courthouse for
at least two of the days during trial."   (Docket 224 at p. 8 n.1) (referencing
Docket 182 at p. 38:12-14).   When the government chose not to call Mr. Iron
Bear as its witness, there is nothing in the record expressing any intention by
the defendant to call Rico Iron Bear as a defense witness at trial.   See Docket
182 at pp. 80:9-12 and 140:17-24.   The court finds the defendant failed to
provide any evidence that the decision not to call Mr. Iron Bear was anything
other than a defense strategy.   Staples, 410 F.3d at 488.   Whether Attorney
Rohl provided effective counsel to defendant by not calling Mr. Iron Bear as a
witness is an issue better resolved in a proceeding brought under 28 U.S.C.
§ 2255.

Defendant's twelfth ground in support of his motion for new trial is
denied.

46

<u>Garrett Waters</u>

Defendant asserts Garrett Waters' statement to S.A. Robinson should have been "viewed before or at trial." (Docket 192 ¶ 14). Waters fails to identify how Garrett's statement would have been admissible at trial. Garrett was a witness subpoenaed to appear at trial. (Docket 137 at p. 5). On May 17, 2019, Garrett confirmed with the United States Marshals Service that he received the subpoena. <u>Id.</u> at p. 6. To assist defense counsel in communicating with Garrett prior to trial, his telephone number was included on the proof of service page. <u>Id.</u>

Garrett was present at the courthouse during the course of trial. (Docket 182 at p. 38:12-17). There is nothing in the record by the defendant asserting any intention to call Garrett as a witness. <u>See</u> Docket 182 at pp. 80:9-12 and 140:17-24. The defendant failed to provide any evidence that the decision not to call Garrett was anything other than a defense trial strategy. <u>Staples</u>, 410 F.3d at 488. Whether Attorney Rohl provided effective counsel to defendant in not calling Garrett as a witness is an issue better resolved in a proceeding brought under 28 U.S.C. § 2255.

Defendant's fourteenth ground in support of his motion for new trial is denied.

<u>S.A. Robinson</u>

It is unclear in defendant's fifth ground for a new trial whether he is asking the question "Why did the court allow S.A. Robinson's testimony to be

impeached?" or "Why was S.A. Robinson trial testimony not impeached with his statement?"   (Docket 192 ¶ 5).   It is clear in the trial record that S.A. Robinson as the lead investigator prepared a report in this case.

During cross-examination, S.A. Robinson was questioned about the inadequacies of his report and his investigation.   Whether that examination impeached the witness' testimony or whether the direct examination by the government challenged the credibility of the witness was an issue the jury could resolve.   Jefferson, 725 F.3d at 834.   See also Docket 141 at p. 25 (Instruction No. 16 – Impeachment) (some capitalization omitted).

In considering a motion for new trial, the court finds the testimony of S.A. Robinson credible.   Campos, 306 F.3d at 579.   While there were some deficiencies in his preparation to testify, the court is satisfied S.A. Robinson competently investigated the shooting at Loren Waters' home and conducted or supervised interviews of the witnesses to that incident.

Defendant's fifth ground for his motion for new trial is without merit and is denied.

Charlie Janis

Defendant's sixth ground for a new trial is similarly confusing.   (Docket 192 ¶ 6).   Defendant's filing seems to be asking: Why was the government allowed to impeach its own witness, Charlie Janis?   Id.

The Federal Rules of Evidence state: "[a]ny party, including the party that called the witness, may attack the witness's credibility."   Fed. R. Evid. 607.

48

Whether the government intended to impeach Mr. Janis' testimony was an issue the jury could resolve.   <u>Jefferson</u>, 725 F.3d at 834.   <u>See also</u> Docket 141 at p. 25.

In considering the defendant's motion for new trial, the court finds the testimony of Mr. Janis credible.   <u>Campos</u>, 306 F.3d at 579.   His description of the events leading up to being shot is consistent with the testimony of the other witnesses present at the Loren Waters' residence, except the defendant, whom the court finds not credible.   <u>Id.</u>

Defendant's sixth ground in his motion for new trial is without merit and is denied.

<u>Evidence Not Produced</u>

Defendant's tenth ground for seeking a new trial asserts that "[o]n April 29, 2019 the government didn't produce all record recordings and reports associated with Federal R. Evid. 412, 413, and 415, and experts under Rule 702." (Docket 192 ¶ 10).   Defendant's submission must be broken down into two parts: first, Fed. R. Evid. 412, 413 and 415; and second, expert reports under Fed. R. Evid. 702.

A.    Fed. R. Evid. 412, 413 and 415

Defendant is making his challenge based on the order setting the trial date and related matters.   (Docket 97).   The scheduling order contains the following stock provision: "[p]roduce all records, recordings and reports

49

associated with Fed. R. Evid. 412, 413 and 415 and experts under Rule 702."

Id. at p. 1.   The deadline for those disclosures was set as April 26, 2019.   Id.

Rules 412, 413 and 415 are not relevant to Mr. Waters' case.   The title of those sections of the Federal Rules of Evidence are:

Rule 412. Sex-Offense Cases: The Victim's Sexual Behavior or Predisposition;

Rule 413. Similar Cases in Sexual-Assault Cases; and

Rule 415. Similar Acts in Civil Cases Involving Sexual Assault or Child Molestation.

Id. (bold omitted).   Without setting forth the text of each rule, it is obvious none of these rules are pertinent to this case.   This is not a sex offense case. Defendant's claim that the government should have produced these types of reports is without merit.   Defendant's tenth ground in the motion for a new trial as the motion relates to Rules 412, 413 and 415 is denied.

B.      Fed. R. Evid. 702

Rule 702 relates to the testimony of expert witnesses.   The government was required by the scheduling order to produce to defense counsel a report for each witness which the government contemplated would be classified as an expert witness.   (Docket 97 at p. 1).   Each of the notice of expert witness filings by the government complied with the court's order.   See Dockets 99 (Mateo Serfontein); 100 (Stacey Smith); 101 (Tayler Ripley); 102 (Dr. Robert Miller); and 119 (Dr. Troy Howard).[29]

---

[29]The government filed a notice of expert witness for Kevin Rascher. (Docket 114).   Trooper Rascher's trial testimony was very brief and he did not offer any expert testimony.

No objections to the adequacy of any expert witness report were interposed during trial.   If defense counsel believed any one or more of the disclosures was inadequate under Fed. R. Crim. P. 16(a)(1)(G), an objection should have been made prior to the witness testifying or during testimony at trial.

Defendant's claim as to expert reports under Rule 702 is without merit. Defendant's tenth ground in the motion for a new trial as it relates to Rule 702 is denied.

<u>Forensic Specialist Testimony</u>

Defendant's eleventh ground in support of his motion for a new trial asserts the forensic specialist testified three shell casing were found at the Waters' home but only one of them matched the gun used by the defendant. (Docket 192 ¶ 11).   This assertion by defendant is without merit.

Mateo Serfontein, a forensic firearms examiner, compared the two fired cartridge cases obtained by law enforcement from the Waters' house with the cartridge cases obtained from test firing the 9mm Luger.   In his professional opinion, Mr. Serfontein concluded both of the spent cartridge cases from the scene were fired from the 9mm Luger.

The court finds the testimony of Mr. Serfontein credible and he was qualified to express the opinions presented to the jury.   <u>Campos</u>, 306 F.3d at 579.   The two cartridge cases obtained from the scene of the shooting were fired from the 9mm Luger used by the defendant on January 25, 2018.

Defendant's eleventh ground in the motion for a new trial is denied.

<u>Miranda Rights</u>

Defendant's thirteenth ground in his motion for new trial asserts that at the time of his arrest on January 25, 2018, he was not given his <u>Miranda</u> rights.   (Docket 192 ¶ 13).   That claim is without merit.

Before trial, defense counsel filed a motion to suppress any statement given to law enforcement on that date.   (Docket 61).   Magistrate Judge Daneta Wollmann conducted an evidentiary hearing and filed a report and recommendation ("R&R") regarding defendant's motion to suppress.   (Docket 87).   Defendant's attorney timely filed objections to the R&R.   (Docket 91).   On April 23, 2019, the court entered an order granting in part and denying in part defendant's motion to suppress.   (Docket 96 at p. 13).

The order addressed whether Waters should have been advised of his <u>Miranda</u> rights prior to Officer Hunter's interview.   <u>Id.</u> at pp. 10-13.   The court adopted the R&R, agreeing with the magistrate judge that Officer Hunter's one question which was "reasonably likely to elicit an incriminating response[]" should be suppressed.   <u>Id.</u> at p. 10.   The balance of the order analyzed the remainder of the defendant's statements and concluded those statements should not be suppressed.   <u>Id.</u> at p. 11-13.

The court finds defendant's challenge to the court's pretrial ruling is not an appropriate ground to seek a new trial.   Defendant's <u>Miranda</u> claim is

properly preserved for a post-sentencing appeal to the United States Court of Appeals for the Eighth Circuit.

Defendant's thirteenth ground in the motion for a new trial is denied.

## MOTION TO DISMISS COUNTS III AND VI

Defendant moves to dismiss count III and count VI.   (Docket 195).   The motion asserts because of the counts of conviction for assault with a dangerous weapon, 18 U.S.C. § 113(a)(3), the related convictions on count III and count VI for brandishing and discharging a firearm during and relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii), are duplicitous and the "Government lacks jurisdiction to further prosecute under [18 U.S.C. §] 1153."   Id. at pp. 2-3. The essence of defendant's argument is that the Major Crimes Act, "18 U.S.C. § 1153 does not encompass [18 U.S.C. §] 924."   Id. at p. 7.

Defendant argues "when there is a crime by an Indian against another Indian within Indian Country only those offenses enumerated in the Major Crimes Act may be tried in the federal courts."   (Docket 208 at pp. 13-14) (referencing United States v. Antelope, 430 U.S. 641, 643 (1977)).   He submits the Major Crimes Act's "present language . . . does not include any language or description of an offense that is similar to 18 U.S.C. § 924(c)[.]"   Id. at p. 14. He contends § 924(c) is "beyond the scope of the Major Crimes Act, and as such may not be charged by the government."   Id. at p. 15 (referencing United States v. Narcia, 776 F. Supp. 491 (D. Ariz. 1991)).

53

Defendant asserts convictions for both 18 U.S.C. §§ 113 and 924(c) violate the Double Jeopardy Clause.  Id. at p. 16.  His reply brief makes the same assertion without citation to any case law which would support his argument.  See Docket 240 at pp. 34-35.

Defendant's third challenge claims that with respect to the assault resulting in serious bodily injury counts, 18 U.S.C. § 113(a)(6), the jury should have been permitted to consider the lesser included offense of simple assault, 18 U.S.C. § 113(a)(5).  (Docket 208 at p. 18).  Waters submits "he should not be exposed to the substantial risk that the jury's practice will diverge from theory. . . . [T]he Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have a jury instruction on a lesser included offense." Id. (referencing Keeble v. United States, 412 U.S. 205 (1973)).

Defendant's fourth challenge is that the jury panel violated the Sixth Amendment.  Id. at p. 31.  He argues the Major Crimes Act "mandates a jury venire drawn from the federal district or division, but only from Indian Country, or community from [the] jurisdiction of the offense be given [sic]."  Id. at pp. 31-32.

SECTION 924(c)

Defendant argues the Major Crimes Act, 18 U.S.C. § 1153, takes jurisdictional priority over § 924.  (Docket 208 at p. 50).  He asserts § 1153 prevails over § 924(c).  Id. at p. 51 (citing United States v. Eagle, 539 F.2d 1166 (8th Cir. 1976)).

54

The United States Court of Appeals for the Eighth Circuit rejected the argument that a § 924(c) offense cannot be prosecuted in Indian country.   On several occasions, the Eighth Circuit rejected the claim "that the only crimes which may be the basis for federal court jurisdiction are those within the Indian Country Crimes Act and the Indian Major Crimes Act."   United States v. Wadena, 152 F.3d 831, 840 (8th Cir. 1998) (referencing United States v. Blue, 722 F.2d 383, 384-86 (8th Cir. 1983); Stone v. United States, 506 F.2d 561, 563 (8th Cir. 1974); United States v. White, 508 F.2d 453, 454-55 (8th Cir. 1974)).   Acknowledging that the general jurisdiction authority of federal criminal laws applies equally to all people, the Wadena court held:

> [F]ederal courts may enforce general federal criminal laws against *all* persons, including Indians within Indian country.   Federal statutes of general applicability, those in which situs of the offense is not an element of the crime, are not encompassed within the Indian Country Crimes Act.   As a result, the Indian–against–Indian exception contained in the Indian Country Crimes Act does not apply to federal criminal laws of general applicability.

Wadena, 152 F.3d at 841 (emphasis in original) (references omitted).

Recognizing the general federal jurisdiction principal, the court held "a section 924(c) prosecution is available where the underlying felony is based on sections 113(c) and 1153."   United States v. Goodface, 835 F.2d 1233, 1238 (8th Cir. 1987).   "To the extent" previous rulings may be "inconsistent with this holding, [cases including Eagle, 539 F.2d 1166] must be considered superseded by the 1976 amendments of sections 113 and 1153."   Id.

55

Defendant's argument fails.   Defendant's motion to dismiss count III and count VI (Docket 195) on this basis is denied.

Double Jeopardy

Section 924(c) as applicable to the jury's verdict provides for the following punishment:

> [A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A)(iii).   Because the jury found the firearm was discharged, the sentence under subsection (iii) of not less than 10 years custody must be served consecutive to the term of imprisonment "imposed for the crime of violence . . . during which the firearm was used[.]"   Id. at ¶ 924(d)(ii).

Where two statutes specifically mandate consecutive sentences, as § 924(c) does in relation to a § 113 conviction, the cumulative punishment does not violate double jeopardy.   Goodface, 835 F.2d 1236 (referencing United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986)).   "The Supreme Court clarified the double jeopardy prohibition against multiple punishments for the same offense in Missouri v. Hunter, 459 U.S. 359 . . . (1983)."   Doffin, 791 at 120.   "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from

prescribing greater punishment than the legislature intended."   Id. (citing

Hunter, 459 U.S. at 366).   Because Congress authorized consecutive

sentences for a § 924(c) violation and the underlying crime of violence, in this

case assault with a dangerous weapon in violation of § 113(3), the government

is entitled to "seek and the trial court . . . may impose cumulative punishment

under [both] statutes in a single trial."   Id. at p. 121 (citing Hunter, 459 U.S.

at 369).

Defendant's motion to dismiss counts III and VI for violation of the

double jeopardy clause is denied.

Lesser Included Offense

Defendant's memorandum contends the court's jury instructions were

defective because they did not include any lesser-included offenses.   (Docket

208 at pp. 18-22).   He argues the court should have included simple assault

or assault by striking, beating or wounding as lesser-included offenses to the

offenses of assault resulting in serious bodily injury in counts II and VI.   Id. at

p. 20.

Generally, a defendant would be entitled to an instruction on a lesser

included offense if the court finds the defendant could be found guilty of the

lesser offense and acquitted of the greater offense.   Keeble, 412 U.S. at 208.

Defendant did not propose a lesser-included offense instruction, either simple

57

assault or assault by striking, beating or wounding.[30]   Had either or both

lesser-included offense instructions been proposed, the court would not have

included them in the court's supplemental instructions because the trial

testimony was contrary.

Defendant admitted shooting both Mr. Janis and Elgie Iron Bear.[31]   That

conduct goes well beyond simple assault and the injuries inflicted are far more

serious than either simple assault or assault by striking, beating or wounding.

"[T]he jury could not rationally find that [Mr. Waters] committed simple assault

but was innocent of assault [resulting in serious bodily injury]."   United States

v. Rainbow, 813 F.3d 1097, 1106 (8th Cir. 2016).

Defendant's motion for a new trial on this basis is denied.

Witness Statements

While not included in defendant's list of grounds for a new trial, his

memorandum asserts the government should have produced the statements of

David Iron Bear, Rico Iron Bear, Tammy Eagle Bull, Garrett Waters and Alyson

Caldwell earlier than two days before trial.   (Docket 208 at pp. 39-44).   Under

the Jencks Act the government is not required to produce a witness' statement

until after the witness has testified on direct examination at trial.   18 U.S.C.

---

[30]Because the defendant failed to object to the court's jury instructions,
he waived appellate review of the issue.   Fed. R. Crim. P. 30(d).

[31]While defendant claims he fired in defense of himself or others, the jury
found the government proved beyond a reasonable doubt that he did not act in
defense of himself or others.   With that decision, there is no doubt defendant
fired the pistol at both victims intending to harm them.

§ 3500(a).   It is the practice in the Western Division of the District of South Dakota for the government to produce witness statements no later than the Friday before the commencement of trial.   United States v. Hazelrigg, No. CR. 08-50062-04, 2009 WL 2997395, at *2 (D.S.D. Sept. 15, 2009).

Defendant did not raise any objection to the timing of the government's production of witness statements prior to or during trial.   Any argument asserted on this basis is waived.   Fed. R. Crim. P. 12(b)(3)(E) (an objection to production of discovery required by Rule 16 "must be raised by pretrial motion[.]"); see also Rule 12(d).

Defendant's motion for a new trial on this basis is denied.

Juror Misconduct

Defendant's memorandum seeks a new trial based on jury misconduct. (Docket 208 at p. 45).   Defendant submits he did not want to proceed with trial after a communication between a juror and Mr. Serfontein occurred.   Id.

A brief, yet inappropriate, contact occurred between a juror and Mr. Serfontein after he finished his testimony and left the witness box.   (Docket 181 at p. 8:1-20).   The court conducted a hearing out of the presence of the jury with counsel and defendant present.   Id. at p. 7.   After examining Mr. Serfontein, the court invited counsel to make further inquiry of the witness. Id. at pp. 8:23-9:3.   The court proposed that when the jury returned to the courtroom, the court would briefly discuss in general terms a violation of the oath taken by each juror.   Id. at pp. 9:20-10:2.

59

Defense counsel told the court, "I believe, having discussed this situation with my client, that we would like to proceed.   We would like to proceed with the trial, is my understanding."   <u>Id.</u> at p.10:21-24.   Defendant agreed with his attorney's representation to the court.   <u>Id.</u> at p. 11:1.   Defense counsel agreed there was no prejudice in proceeding with trial.   <u>Id.</u> at p. 11:13-14.   No further record was made by the defendant.

The court resolved the juror's inappropriate communication with Mr. Serfontein as quickly as possible after the matter was brought to the court's attention.   Both defense counsel and the defendant agreed with the court's proposed course of action.   The matter was resolved swiftly on a properly developed record.   No prejudice to defendant's right to a fair and impartial jury occurred.

Mr. Waters' motion for a new trial on this basis is denied.

## VERDICT AGAINST THE WEIGHT OF THE EVIDENCE

As stated earlier in this order, "[w]here a defendant moves for a new trial on the grounds that the verdict is contrary to the weight of the evidence, the district court should grant the motion if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." <u>McCraney</u>, 612 F.3d at 1064. "[A] new trial motion based on insufficiency of the evidence is to be granted only if the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." <u>Camacho</u>, 555 F.3d at 705.   The court's discretion is limited to the extent the

60

court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur.   <u>Lacey</u>, 219 F.3d 783-84.

The court finds Elgie Iron Bear, David Iron Bear, Nona Warrior, Charlie Janis, Loren Waters and Lance Leftwich were credible witnesses.   <u>Campos</u>, 306 F.3d at 579.   Their testimony is internally trustworthy and consistent with the other credible witnesses present at the Waters' residence.   <u>Id.</u>   To be clear, the court finds the testimony of defendant was inconsistent with the other witnesses, was self-serving and not credible.   <u>Id.</u>   The court finds Dr. Miller and Dr. Howard credible and that their testimony was helpful to the jury in understanding the injuries suffered by Elgie Iron Bear and Charlie Janis as a result of the shooting.   <u>Id.</u>

The court does not find "the weight of the evidence is heavy enough in favor of acquittal that a guilty verdict may have been a miscarriage of justice." <u>Camacho</u>, 555 F.3d at 705.   In making its determination, the court weighed the evidence and assessed the credibility of the witnesses.   <u>See</u> <u>Lacey</u>, 219 F.3d at 783-84.   The court considered defendant's written submissions, the government brief in opposition to the defendant's motion and reviewed the trial transcripts.   Having presided over the trial and watched the presentation of the evidence very carefully, the court finds the jury was faced with the difficult tasks of weighing the evidence and assessing witness credibility.   The jury was in the best position to perform this function.   Although the jury's verdict was contrary to defendant's interests, that does not render the verdict a miscarriage of justice.   The court finds there is no miscarriage of justice by allowing the

61

jury verdict to stand.   Lacey, 219 F.3d at 783-84.   Furthermore, the court agrees with the jury's verdict.   Defendant is not entitled to a new trial on the indictment on sufficiency of the evidence grounds under Fed. R. Crim. P. 33(a).

Defendant's motion for a new trial is denied.

**ORDER**

Based on the above analysis, it is

ORDERED that defendant's motion for a new trial (Docket 192) is denied.

IT IS FURTHER ORDERED that defendant's motion to dismiss count III and count VI (Docket 195) is denied.

IT IS FURTHER ORDERED that defendant's additional claims for a new trial raised in his memorandum (Docket 208) are denied.

IT IS FURTHER ORDERED that an order will be entered scheduling the necessary deadlines for defendant's sentencing hearing.

IT IS FURTHER ORDERED that the Clerk's Office shall provide Mr. Waters with a copy of this order via CERTIFIED MAIL.

Dated May 19, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE